IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,639

STATE OF KANSAS,
*Appellee*,

v.

ANSON R. BERNHARDT,
*Appellant*.

SYLLABUS BY THE COURT

1.

The use of pattern jury instructions (PIK) published by the Kansas Judicial Council is not mandatory but is strongly recommended. If the particular facts in a given case require modification of the pattern instruction or addition of language not included in PIK, the district court should not hesitate to make such modification or addition. Absent such need, PIK instructions should be used.

2.

On the facts of this case, the district judge did not err by adding language to the PIK instruction defining "premeditation."

3.

It is not error to give two separate lesser included offense instructions on alternative theories of intentional and reckless second-degree murder.

4.

On the evidence in this case, an instruction on the lesser included offense of voluntary manslaughter was not factually appropriate.

5.

Amendments to K.S.A. 21-6620 in 2013 changed the procedure for imposing a hard 50 sentence for premeditated first-degree murder. Retroactive application of the amendments does not violate the Ex Post Facto Clause of the United States Constitution.

6.

Under K.S.A. 2015 Supp. 21-6620(e)(5), a hard 50 sentence may be imposed if a jury finds beyond a reasonable doubt that one or more aggravating circumstances exist and that they are not outweighed by one or more mitigating circumstances. On the facts of this case, there was sufficient evidence for a rational factfinder to find beyond a reasonable doubt that the defendant committed the murder in an especially heinous, atrocious, or cruel manner and that the existence of this aggravating circumstance was not outweighed by any of the mitigating circumstances.

Appeal from Sedgwick District Court; WILLIAM SIOUX WOOLLEY, judge. Opinion filed May 27, 2016. Judgment of the district court is affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Anson R. Bernhardt appeals his conviction for premeditated first-degree murder.

Bernhardt raises three instructional issues, arguing the district judge erred by (1) adding language to a pattern jury instruction defining premeditation; (2) giving two separate jury instructions on intentional second-degree murder and reckless second-degree murder instead of a single instruction covering both theories; and (3) failing to instruct on voluntary manslaughter. He also claims the cumulative effect of these errors deprived him a fair trial. Bernhardt further contends the district judge erred by applying the 2013 amendments to Kansas' hard 50 sentencing scheme retroactively, and he challenges the aggravating circumstances ultimately relied upon to support imposition of his hard 50 sentence.

We hold that there was no error and affirm Bernhardt's conviction and sentence.

FACTUAL AND PROCEDURAL BACKGROUND

We review the evidence in the record before us at greater length than we otherwise might because of the nature of the challenges Bernhardt advances on appeal.

On the afternoon of September 29, 2012, Bernhardt picked up his live-in girlfriend Amber Kostner from work. About 7 that evening, the two went to a party, picking up their friend Josie Breeden on the way. Bernhardt left the party about 10:30 to take Breeden home, then returned to the party for a short time. When he and Kostner left, she was not ready to go home; so they went to a bar and stayed there for 15 to 20 minutes.

3

The next morning, Officer Keith Luongo responded to a report that there was a body in a ditch across the road from Campus High School in Haysville. The body would later be identified as Kostner's.

The Sedgwick County Sheriff's Department took Bernhardt into custody for questioning, and he spoke to a detective in a taped interview that would later be introduced at trial. In the interview, Bernhardt initially said that he had not seen Kostner since she left the bar they had gone to after the party. He claimed that Kostner walked out of the bar during an argument. But, as Bernhardt explained the events in more detail, he contradicted his earlier statement. He then said that he and Kostner had gone home together from the bar and that she had later left.

While he and Kostner were en route home, Bernhardt said Kostner was saying things like: "For God sake Anson I'm a grown ass woman" and "I wanna have another drink, I'll have another drink." Bernhardt said that, once the couple arrived home, he told Kostner they could not keep arguing because his mother would kick them out of the house. It was at that point that Kostner told Bernhardt to "fuck off" and left. Bernhardt said it was not unusual for Kostner to leave after they had a fight.

Bernhardt then told the detective that he became worried the next morning when he woke up and Kostner had not returned. Bernhardt called several of Kostner's friends and relatives, as well as hospitals and the jail, but no one had seen or heard from her. Bernhardt also recounted what he had done the rest of the day, which included spending time on the Internet playing games, helping a friend work on a car, and then spending the afternoon at Breeden's house. That evening, Bernhardt went to a couple of bars. He was at the second bar when officers asked him to come in for questioning.

Investigators then had Bernhardt repeat his story, asking for additional details at various points. One of the investigators asked Bernhardt why Kostner's car might have been by Campus High School. Bernhardt initially denied knowing why the car would have been there, but the investigators' repeated requests that he explain led eventually to his confession:

"Investigator: What happened?

"Bernhardt: I beat the crap out of her and dumped her body.

. . . .

"Investigator: Well you say you beat the crap out of her. How?

"Bernhardt: I—was kicking her.

"Investigator: Where at?

"Bernhardt: Everywhere. . . . I pretty much kicked her everywhere. And I threw her in the backseat and I drove her to 55th and Meridian and dumped her off."

Bernhardt then elaborated, beginning with events in the car after he and Kostner left the bar: "She was yelling at me, she reached over and smacked me and I was driving and—I pulled over and pulled her over to—out of the driver's side by her hair and then she hit the ground and I started kicking her." He also told the officers that Kostner "screamed for a second when I pulled her hair. Pulled her out of the car. And then she— she wasn't really saying anything after that."

Bernhardt said that after he finished kicking Kostner he put her in the backseat and started driving; but, before he reached his ultimate destination, he stopped and put her in

5

the trunk because of "[t]he sound of her breathing." He said that "[i]t was—it wasn't like smooth breathing. It was kinda garbled, like—probably blood or something." He "didn't wanna hear her."

When Bernhardt reached 55th and Meridian, "[he] pulled over . . . [a]nd [he] pulled her out of the trunk and [he] kinda threw her but she kinda rolled a little bit." Then he left. Bernhardt told the officers that Kostner "was still breathing when [he] threw her on the side of the road," and he did not know she had died until the interview. When asked why he would leave Kostner on the side of the road if she was still breathing, Bernhardt said he "was probably scared or something." When asked if he left Kostner by the side of the road because he thought she was going to die, Bernhardt answered: "Maybe. I don't know."

Bernhardt said initially that he did not know how many times he kicked Kostner. But, when pressed, he said: "20? 30? I don't know." He also said that he "probably" kicked Kostner in the head, "[p]retty much from her waist up."

When asked if he had considered calling an ambulance for Kostner or otherwise getting her help, Bernhardt said: "I thought about it later and I thought about going and getting her and taking her to the hospital, taking her to the emergency room." When asked why he had not done so, Bernhardt said he did not know.

Bernhardt's statements led to the charge of first-degree premeditated murder.

At trial, the State's primary evidence against Bernhardt was the video of his interview. The State also put on several witnesses who corroborated many of the details Bernhardt had given about what he and Kostner had been doing the night of her murder and what he did the next morning. Dr. Scott Kipper, Sedgwick County's deputy coroner

6

and medical examiner, testified about the results of Kostner's autopsy. In his opinion, Kostner had suffered at least six distinct blows to the front of her head, and "[t]he cause of death was multiple blunt force injuries, and the manner was homicide." Kipper also opined that it was possible that Kostner would have survived, had she received "immediate medical attention."

After both the State and defense rested, the district court judge and counsel discussed jury instructions. The State requested additions to the Pattern Instructions for Kansas (PIK) language on premeditation, arguing it was necessary for the jury to understand that Bernhardt did not have to have thought about killing Kostner before their physical altercation began.

The unadorned PIK language read:

"'Premeditation' means to have thought over the matter beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

The State requested that the district judge add the following three paragraphs:

"Premeditation does not have to be present before a fight, quarrel, or struggle begins. Premeditation is the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned, contrived, or schemed beforehand.

"Premeditation can be inferred from other circumstances including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) dealing of lethal blows after the deceased was felled and rendered helpless.

7

"Premeditation can occur during the middle of a violent episode, struggle, or fight."

Bernhardt's lawyer objected to these paragraphs, arguing they were "outside of what PIK 4 calls for, and I don't believe it's appropriate." The judge acknowledged a preference for using PIK language alone but granted the State's request because the additional language accurately stated the law. He further observed that, based on the facts of the case, "there is more than a slight possibility of confusion by the jury about when premeditation can or cannot occur and what evidence can be used to prove premeditation."

After the district judge granted the State's request, Bernhardt asked for a different, additional paragraph. That brief paragraph was inserted between the PIK language and the three paragraphs that had been sought by the State; it read: "Premeditation is the process of thinking about a proposed killing before engaging in homicidal conduct." The State did not object to this further addition to the instruction.

The discussion then turned to which lesser included offenses instructions should be given. The State requested an intentional second-degree murder instruction but opposed a reckless second-degree murder instruction. The district judge concluded that the jury should be instructed on both theories. The prosecutor then advocated for putting the reckless second-degree murder description in an instruction separate from that for intentional second-degree murder, saying: "The law is clear that the jury should first consider second-degree intentional and if they cannot reach a unanimous decision then consider second-degree reckless." Bernhardt's lawyer opposed separating the theories into two instructions, because he believed that was the PIK design. The judge ultimately agreed with the State and gave two separate instructions.

The judge discussed Bernhardt's request for a voluntary manslaughter instruction. Bernhardt argued that "there [was] some factual basis to support a heat of passion, intense emotional excitement" because Bernhardt "was struck by [Kostner] and he just—he stopped the car and he pulled her out and he reacted." The district judge denied the request for the voluntary manslaughter instruction, noting "the provocation, whether it be a sudden quarrel or some other form of provocation, must be sufficient to cause an ordinary man to lose control of his actions and reason."

Thus, after the first-degree murder instruction, which included the language on premeditation, the jury was given the following general lesser included offense instruction:

> "The offense of murder in the first degree with which defendant is charged includes the lesser offenses of murder in the second degree (intentionally) and murder in the second degree (recklessly).
>
> "You may find the defendant guilty of murder in the first degree, murder in the second degree (intentionally), murder in the second degree (recklessly) or not guilty.
>
> "When there is a reasonable doubt as to which of two or more offenses defendant is guilty, he may be convicted of the lesser offense only."

The separate instructions for intentional second-degree murder and reckless second-degree murder followed. On one page, the instruction read:

> "If you do not agree that the defendant is guilty of murder in the first degree, you should then consider the lesser included offense of murder in the second degree (intentionally).

9

"To establish this change, each of the following claims must be proved:

"1. The defendant intentionally killed Amber Lynn Kostner.

"2. This act occurred on or about the 30th day of September, 2012, in Sedgwick County, Kansas.

"The State must prove that the defendant committed this crime of murder in the second degree intentionally. A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State."

The next page read:

"If you do not agree that the defendant is guilty of murder in the second degree (intentionally), you should then consider the lesser included offense of murder in the second degree (recklessly).

"To establish this charge, each of the following claims must be proved:

"1. The defendant killed Amber Lynn Kostner unintentionally but recklessly under circumstances that show extreme indifference to the value of human life.

"2. This act occurred on or about the 30th day of September, 2012, in Sedgwick County, Kansas.

"The State must prove that the defendant committed this crime of murder in the second degree recklessly. A defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk that a result of the defendant's actions will follow. This act by the defendant disregarding the risk must be a gross deviation from the standard of care a reasonable person would use in the same situation."

The verdict form gave the jury four options—guilty of first-degree murder, guilty of intentional second-degree murder, guilty of reckless second-degree murder, and not guilty—in that order. The jury took the first option.

Approximately a month before Bernhardt was convicted on July 11, 2013, the United States Supreme Court issued its decision in *Alleyne v. United States*, 570 U.S. ____, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013). In that opinion, the Court held that facts relied upon to increase a mandatory minimum sentence constitute elements of an offense that must be proved to a jury beyond a reasonable doubt to avoid a violation of the Sixth Amendment right to jury trial. Under Kansas law in effect at the time Kostner was murdered, the usual mandatory minimum sentence for premeditated first-degree murder was life without the possibility of parole for 25 years, *i.e.*, a hard 25. The hard 25 could be increased to a hard 50 if the sentencing judge found the existence of one or more aggravating factors by a preponderance of the evidence.

On September 6, 2013, before Bernhardt's sentencing hearing, the legislature amended K.S.A. 2013 Supp. 21-6620 to alter the procedure for imposing a hard 50 sentence and bring it in line with the holding of *Alleyne*. The amended statute requires a jury to find beyond a reasonable doubt that at least one aggravating circumstance exists and that any aggravating circumstances are not outweighed by any mitigating circumstances, before a hard 50 can be imposed.

The district judge in this case ruled that the amended statute could be applied to Bernhardt without violating the Ex Post Facto Clause of the United States Constitution. Bernhardt then waived his right to have a jury make any findings of aggravating and mitigating circumstances and instead tried the issue to the judge.

11

At the bench trial on the appropriateness of a hard 50, the State relied on the evidence from trial to establish the aggravating circumstances. Bernhardt testified on his own behalf about his alcoholism. Bernhardt's mother also testified, telling the judge about Bernhardt's alcohol problem and his problems with his ex-wife. She said Bernhardt's ex-wife caused him to "tr[y] to slice his wrist" and that, shortly before Kostner's death, he "looked like . . . he was having a nervous breakdown" after talking to his ex-wife. After the defense presented additional evidence of mitigating circumstances, the district judge listed the aggravating factors the State had alleged:

"(1) [T]he defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution; . . . (2) . . . the defendant committed the crime in an especially heinous, atrocious or cruel manner; and . . . (3) . . . the victim was killed while engaging in, or because of the victim's performance or prospective performance of, the victim's duties as a witness in a criminal proceeding."

The defense argued that three mitigating circumstances were present:

"[U]nder K.S.A. 21-6625, subparagraph (a), number (1) 'The defendant has no significant history of prior criminal activity'; number (2), 'The crime was committed while the defendant was under the influence of extreme mental or emotional disturbances'; and number (6) 'The capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform the defendant's conduct to the requirements of the law was substantially impaired.'"

Before ruling, the district judge made some general comments about the evidence:

"The only specific comments the Court will make with regard to evidence is, there is the evidence that he kicked her in the head until she was unconscious. He kicked her after she was unconscious. He transferred her to the trunk because of the noise that she was making. He drove ten to 15 minutes to leave her in a ditch while she was still

12

alive and then he drove ten to 15 minutes back home. And according to the transcript, he thought about taking her to the hospital but he didn't."

After considering the evidence and arguments of counsel, the district judge then found

"beyond a reasonable doubt that the following aggravating circumstances have been established by the evidence and are not outweighed by mitigating circumstances found to exist:

"Number (1), that the defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution; number (2), that the defendant committed the crime in an especially heinous, atrocious or cruel manner. Those are the only aggravating circumstances the Court is finding.

"The defendant shall be sentenced accordingly."

Bernhardt's counsel asked the district judge to "note" a "contemporaneous objection to the Court's finding," which the district judge agreed to do. The prosecutor then asked if the district judge needed to state on the record whether he had found that any mitigating circumstances existed. The district judge declined to do so.

At a subsequent sentencing hearing, the State again made a request about putting findings on mitigating circumstances on the record, and the district judge noted that Bernhardt had a criminal history of "more than one page, but the majority of it are driving offenses, or similar-type offenses; misdemeanors." The judge therefore concluded that Bernhardt did not have a significant criminal history. The district judge rejected mitigators on the crime being "committed while the defendant was under the influence of extreme mental or emotional distress" and on "[t]he capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform the defendant's

13

conduct to the requirements of the law" being substantially impaired. The district judge then imposed a hard 50 for Bernhardt's murder of Kostner.

## PREMEDITATION INSTRUCTION

Bernhardt first takes aim on appeal at the premeditation jury instruction. His counsel fully preserved this issue for our review by objecting in district court. See *State v. Brownlee*, 302 Kan. 491, 512, 354 P.3d 525 (2015); K.S.A. 2015 Supp. 22-3414(3).

For jury instruction issues such as this, we employ a multistep analysis:

"'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).'" *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015).

As we apply this framework, we also consider "the instructions as a whole without isolating any one instruction" and we review "the instruction to see whether it properly and fairly stated the law as applied to the facts of the case and could not have reasonably misled the jury. *State v. Horton*, 300 Kan. 477, 491, 331 P.3d 752 (2014) (citing *State v. Appleby*, 289 Kan. 1017, 1059, 221 P.3d 525 [2009]).

Although not entirely clear from Bernhardt's brief, it appears that he specifically questions whether the instruction as given was legally appropriate.

14

Bernhardt first contends that PIK language helps to ensure due process through uniformity and that the PIK instruction fully and clearly conveyed the law on premeditation. This argument is undercut by Bernhardt's own request that the district judge add to the PIK language, although we acknowledge that his counsel may have been trying to fashion a silk purse out of a sow's ear after the judge had agreed to add the three paragraphs sought by the State.

"Failure to use the exact language of a PIK instruction is not fatal and does not automatically require reversal. Prejudice must still be shown." *State v. Mitchell*, 269 Kan. 349, Syl. ¶ 5, 7 P.3d 1135 (2000).

> "The use of PIK instructions is not mandatory but is strongly recommended. The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the district court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed." *State v. Dixon*, 289 Kan. 46, Syl. ¶ 10, 209 P.3d 675 (2009).

In this case, where Bernhardt admitted that he and Kostner had been arguing before he pulled her out of the car and started kicking her, the judge believed there was a possibility of jury confusion on when premeditation can or cannot occur and on the type of evidence that may be relied upon to demonstrate it. We see no error on the basis of the district judge's deviation from PIK to include that language in this case.

Bernhardt also has argued that the additions improperly focused on how quickly premeditation can form. He relies on our decision in *State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006), and two Arizona cases, *State v. Thompson*, 204 Ariz. 471, 65 P.3d 420 (2003), and *State v. Guerra*, 161 Ariz. 289, 778 P.2d 1185 (1989), for the general proposition that premeditation cannot be formed in an instant. This is true, and it is error to tell a jury the opposite.

In *Gunby*, the prosecutor made several "troubling" statements during closing:

"(1) '[P]remeditation can occur after the chain of events,' (2) '[A]t some point after he started hitting and strangling her . . . [the defendant] made the conscious decision, "I want to kill you" . . . [and] that's when he premeditate[d],' (3) A defendant 'cannot intentionally strangle somebody to death without there being premeditation,' and (4) It is 'impossible to intentionally strangle somebody to death without knowing, thinking and wanting that person to die [and] that is all that is required for premeditation . . . that is the premeditation.'" 282 Kan. at 64.

We noted that "these remarks defined premeditation somewhere between the level of forethought outlined in the PIK instruction we have endorsed . . . and the 'instantaneous' timing we have disapproved." 282 Kan. at 64. After comparing the statements in *Gunby* to the facts in two other cases in which we had affirmed jury findings of premeditation in strangulation cases, the court held that it regarded "the prosecutor's statements in this case as barely outside the broad latitude permitted him in discussing the evidence in this case" and said that "whatever error they may have injected into the trial was harmless." 282 Kan. at 65; see also *State v. Scott*, 271 Kan. 103, 108, 21 P.3d 516 (2001) (continued application of pressure over a period of time sufficient for a jury to find victim's death premeditated); *State v. Jones*, 279 Kan. 395, 402, 109 P.3d 1158 (2005) (affirming *Scott*'s holding that jury can find defendant's state of mind changed from intent to premeditation at any time during violent episode that causes victim's death).

16

In *Guerra*, the Arizona Supreme Court stated that "a jury may be misled by an instruction placing undue emphasis on the rapidity with which premeditation can occur." 161 Ariz. at 294. But the *Guerra* court ultimately approved of a jury instruction stating:

"Premeditation means that the defendant's intention or knowledge existed before the killing long enough to permit reflection.

"The time for reflection need not be prolonged and there need be no appreciable space of time between the intention to kill unlawfully and the act of killing.

"*It may be as instantaneous as the successive thoughts of the human mind, however it must be longer than the time required to form the intent or knowledge that such conduct will cause death*.

"*An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion*." (Emphasis added.) 161 Ariz. at 293-94.

The court concluded that the instruction before it, read as a whole, properly instructed the jury on premeditation. 161 Ariz. at 294.

In *Thompson*, the Arizona Supreme Court reiterated its concern about undue emphasis on the passage of time in a premeditation jury instruction. 204 Ariz. at 476. But the issues actually decided by the court were whether a moment of reflection was necessary for premeditation to occur and whether the State was required to prove such reflection through direct evidence. 204 Ariz. at 478. *Thompson* plows no new analytical ground for Bernhardt.

We conclude that the prosecutor's statements in *Gunby* and instructions in the Arizona cases were substantively—and significantly—different from the three paragraphs

17

on premeditation at issue here. The *Gunby* prosecutor said that strangulation was not possible without premeditation. Bernhardt's jury instruction did not make such a categorical statement or direct the jury to find premeditation because of his continuous infliction of blows. Instead, the instruction stated premeditation "does not have to be present before a fight, quarrel, or struggle" and is not necessarily "planned, contrived or schemed beforehand." Again, these are correct statements of Kansas law. See *Scott*, 271 Kan. at 108, 111. Bernhardt's instruction also did not focus explicitly on how quickly premeditation can form, the flaw in the Arizona cases. *Cf. State v. Moncla*, 262 Kan. 58, Syl. ¶ 6, 936 P.2d 727 (1997) (jury instruction "that premeditation may arise in an instant" inappropriate because diminishes importance of the element of premeditation).

We are persuaded that the three challenged paragraphs did not communicate that premeditation could be instantaneous, only that it could form during or after an initial altercation. This means that, read as a whole, the premeditation instruction "properly and fairly stated the law as applied to the facts of the case." *Horton*, 300 Kan. at 491. The instruction correctly informed the jury that Bernhardt did not have to premeditate Kostner's murder before pulling her out of the car and beginning to kick her.

The district judge did not err in modifying the PIK instruction as requested by the State. Accordingly, we need not reach the question of whether any error was harmless.

INTENTIONAL SECOND-DEGREE MURDER AND
RECKLESS SECOND-DEGREE MURDER INSTRUCTIONS

Bernhardt next complains that the district judge erred in giving separate lesser included offense instructions for intentional second-degree murder and reckless second-degree murder.

18

This court reviews lesser included offense instructions using the same general framework outlined in the previous section. More specifically, when considering the legal appropriateness of a lesser included offense, "an appellate court asks whether the lesser crime is 'legally an included offense of the charged crime.'" *Armstrong*, 299 Kan. at 432.

Bernhardt preserved this issue for appellate review. After the district judge in this case decided to instruct on both intentional and reckless second-degree murder, his discussion with counsel turned to whether separate instructions should be given for each theory. Bernhardt argued that both second-degree murder theories should be given in the same instruction, separated by "or." The State argued that because reckless second-degree murder is a lesser included offense of intentional second-degree murder, the court should give two separate instructions. The State ultimately prevailed.

Under K.S.A. 2015 Supp. 21-5109(b), a lesser included crime is:

"(1) A lesser degree of the same crime, except that there are no lesser degrees of murder in the first degree under subsection (a)(2) [felony murder] of K.S.A. 2015 Supp. 21-5402, and amendments thereto;

"(2) a crime where all elements of the lesser crime are identical to some of the elements of the crime charged;

"(3) an attempt to commit the crime charged; or

"(4) an attempt to commit a crime defined under paragraph (1) or (2)."

We have recognized five degrees of homicide, in descending order: capital murder, first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter. *State v. Cheever*, 295 Kan. 229, 258-59, 284 P.3d 1007 (2012)

19

(adding capital murder to homicide hierarchy), *vacated on other grounds and remanded* 571 U.S. ___, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013). Based on this hierarchy, intentional and reckless second-degree murder are both lesser included offenses of first-degree murder under K.S.A. 2014 Supp. 21-5109(b)(1). See *State v. Killings*, 301 Kan. 214, 222, 225, 340 P.3d 1186 (2015). It was therefore legally appropriate to instruct the jury on both theories of second-degree murder.

Bernhardt argues that, although it was legally appropriate to give a second-degree murder instruction, it was not appropriate to divide intentional and reckless into separate instructions. Doing so meant that the jury would not consider reckless second-degree murder unless it could not agree on intentional second-degree murder, which incorrectly treated reckless as a lesser included offense of intentional. The State counters that Bernhardt seeks "a departure from the long-standing rule that homicide offenses are to be considered in order of severity."

Strictly speaking, Bernhardt is correct that reckless second-degree murder is not a lesser included offense of intentional second-degree murder. Because they have different mens rea requirements, reckless second-degree murder does not qualify as a lesser offense under K.S.A. 2015 Supp. 21-5109(b)(2) (all elements of lesser crime identical to some elements of greater). But intentional second-degree murder and reckless second-degree murder are assigned different severity levels, see K.S.A. 2015 Supp. 21-5403(b) (intentional severity level 1, person felony; reckless severity level 2, person felony), with reckless designated the less serious crime. And, as the State correctly notes, we have clearly stated that "in the interests of promoting an orderly method of considering the possible verdicts, 'a trial court should instruct on lesser included offenses in the order of severity beginning with the offense with the most severe penalty.' [*State v.*] *Trujillo*, 225 Kan. [320,] 324, [590 P.2d 1027 (1979)]." *State v. Adams*, 292 Kan. 60, 77, 253 P.3d 5 (2011).

20

Moreover, contrary to Bernhardt's insistence before the district judge, PIK's second-degree murder section does not clearly call for a district judge to use a single instruction for both intentional and reckless second-degree murder. PIK Crim. 4th 54.140 provides in relevant part:

"To establish this charge [of second-degree murder], each of the following claims must be proved:

"1. The defendant intentionally killed *insert name of victim.*

"OR

"1. The defendant killed *insert name of victim* unintentionally but recklessly under circumstances that show extreme indifference to the value of human life.

"2. This act occurred on or about the ___ day of _____, _____, in _____ County, Kansas."

Because both the intentional and reckless theories are labeled with the number "1," PIK conveys that each theory is meant to be considered separately. Whether that separate consideration is prompted by a single instruction on one page or two successive instructions on two pages matters not, as long as the reckless crime, the one with the lesser severity rating, comes second.

We conclude the district judge did not err by giving separate instructions on intentional and reckless second-degree murder. We need not engage in a harmlessness analysis.

21

In his third and final jury instruction issue, Bernhardt argues the district judge erred by failing to instruct on voluntary manslaughter. The four-step framework applied in the previous sections also applies here. See *Brownlee*, 302 Kan. at 511.

Bernhardt asked for and was denied a voluntary manslaughter instruction, so the issue is fully preserved for our review. Voluntary manslaughter is a lesser included offense of first-degree premeditated murder and therefore was legally appropriate. See *Brownlee*, 302 Kan. at 512.

The next step in the analysis is whether a voluntary manslaughter instruction was factually appropriate.

"In order to require the instruction, there must have been evidence that would reasonably justify a conviction of the lesser included crime. [*State v. Story*,] 300 Kan. [702,] 710 [, 334 P.3d 297 (2014)]. This court does not speculate about hypothetical scenarios. 300 Kan. at 710 (quoting [*State v.*] *Wade*, 295 Kan. [916,] 925, [287 P.3d 237 (2012)]).

"'The key elements of voluntary manslaughter under K.S.A. 21-3403 are an intentional killing and legally sufficient provocation. [Citation omitted.] When reviewing whether provocation was legally sufficient, an objective test is used. [Citation omitted.] "Heat of passion" has been defined as "any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror," based "on impulse without reflection." [Citation omitted.] The provocation "'must be sufficient to cause an ordinary man to lose control of his actions and his reason.'" [Citations omitted.]

. . . .

"'[I]n order to reduce a homicide from murder to voluntary manslaughter, there must be an adequate provocation that deprives a reasonable person of self-control and causes that person to act out of passion rather than reason. Mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter.' [*State v.*] *Hayes*, 299 Kan. [861,] 864-66[, 327 P.3d 414 (2014)].

"A sudden quarrel can be one form of heat of passion. *State v. Johnson*, 290 Kan. 1038, 1048, 236 P.3d 517 (2010). '[A]n unforeseen angry altercation, dispute, taunt, or accusation could fall within th[e] definition [of heat of passion] as sufficient provocation.' 290 Kan. at 1048. '"The hallmark of heat of passion is taking action upon impulse without reflection."' *State v. Hilt*, 299 Kan. 176, 194, 322 P.3d 367 (2014) (quoting *Wade*, 295 Kan. at 925)." *Brownlee*, 302 Kan. at 512-13.

Bernhardt argues that Kostner's slapping him during their argument was objectively sufficient provocation to warrant a voluntary manslaughter instruction.

In *State v. Johnson*, 290 Kan. 1038, 236 P.3d 517 (2010), this court provided definitions for "heat of passion," "sudden," and "quarrel."

"'Heat of passion' is defined as:

'Rage, terror, or furious hatred suddenly aroused by some immediate provocation, usually another person's words or actions. At common law, the heat of passion could serve as a mitigating circumstance that would reduce a murder charge to manslaughter. Also termed sudden heat of passion; sudden heat; sudden passion; hot blood; sudden heat and passion; furor brevis.' Black's Law Dictionary 791 (9th ed.).

23

"'Sudden' is commonly defined as: '1. Happening without warning; unforeseen. 2. Characterized by hastiness; abrupt; rash. 3. Characterized by rapidity; quick; swift.' The American Heritage Dictionary of the English Language 1286 (1969).

"'Quarrel' is defined as: 'An altercation or angry dispute; an exchange of recriminations, taunts, threats, or accusations between two persons.' Black's Law Dictionary 1363 (9th ed.); 'An angry dispute; an altercation.' The American Heritage Dictionary of the English Language 1069 (1969)." 290 Kan. at 1047-48.

The evidence in this case—even from Bernhardt's own mouth—showed that he and Kostner began arguing while they were at the bar, and the argument continued during their car ride home. During that ride, Kostner slapped Bernhardt, and, at that point, he stopped, pulled her out of the car, and kicked her repeatedly. He then threw Kostner into the backseat of the car and began driving. After hearing Kostner's "garbled" breathing, Bernhardt stopped the car again, put Kostner in the trunk, and continued driving until he stopped a third time and abandoned Kostner in a roadside ditch. He believed Kostner was still alive at the time.

This evidence makes Bernhardt's position on this issue problematic for several reasons. The initial argument between Bernhardt and Kostner was insufficient to qualify as provocation supporting a voluntary manslaughter instruction. *Cf. State v. Hayes*, 299 Kan. 861, Syl. ¶ 4, 327 P.3d 414 (2014) ("Mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter.") In addition, according to Bernhardt's statement, this type of argument was not unusual for the two, which tends to negate the "sudden" aspect of sudden quarrel; the argument did not happen "without warning" and was foreseeable. Although Kostner did slap Bernhardt, the slap occurred during their ongoing argument and "mere evidence of an altercation between parties does not alone support finding sufficient provocation." See *State v.*

24

*Northcutt*, 290 Kan. 224, 234, 224 P.3d 564 (2010). As the State notes in its brief, Bernhardt "did not indicate that he somehow snapped, experienced a break from reality, felt insulted, denigrated, or suffered a personal affront." See *Brownlee*, 302 Kan. at 513. Even if the slap were an objectively reasonable cause for Bernhardt to act impulsively, his later, coldly callous behavior was not impulsive. After kicking her repeatedly, he placed her first in the backseat and then, when what he imagined to be blood in her airway made a sound that disturbed him, in the trunk. Rather than take her to hospital, which he considered, he dumped her on the side of a road where he left her to die. Had Bernhardt stopped short of even this final step, Kostner might have survived his brutality.

On these facts, a voluntary manslaughter instruction was not factually appropriate. It was not error for the district judge to refuse Bernhardt's request for one. Again, we need not decide whether any error was harmless.

CUMULATIVE ERROR

Bernhardt asserts the cumulative effect of the district judge's trial errors warrants reversal of his conviction. Because we have not identified any trial errors, the cumulative error doctrine does not apply. See *State v. Reed*, 302 Kan. 390, 404, 352 P.3d 1043 (2015).

RETROACTIVE APPLICATION OF THE AMENDED HARD 50 STATUTE

We have previously declined to address the retroactive application of the amended hard 50 statute because the issue has not been ripe. See, *e.g.*, *State v. Roeder*, 300 Kan. 901, Syl. ¶ 13, 336 P.3d 831 (2014) (issue not ripe until prosecutor chooses to pursue hard 50 on remand). The issue is ripe in this case, but the circumstances are different from those in cases in which we have vacated the sentences of defendants who were

25

sentenced under the previous statute. See, *e.g.*, 300 Kan. at 940. Here, Bernhardt committed his crime before the legislature amended the statute but was sentenced after the amendments' effective date. Holding application of the amended statute to Bernhardt would not violate the Ex Post Facto Clause, the district judge employed the statute to arrive at Bernhardt's sentence. Bernhardt now relies on the clause in his appellate challenge.

This court reviews questions of both statutory and constitutional law de novo. *State v. Garcia*, 285 Kan. 1, 7, 169 P.3d 1069 (2007).

As mentioned above, the United States Supreme Court decided *Alleyne v. United States*, 570 U.S. ____, 133 S. Ct. 2151, 2158, 186 L. Ed. 2d 314 (2013), in June 2013, holding that facts used to increase a mandatory minimum sentence are elements of the offense that must be submitted to a jury and found beyond a reasonable doubt to avoid a violation of the Sixth Amendment right to jury trial. The Kansas statutory scheme in place at that time permitted the sentencing judge in a first-degree murder case to find by a preponderance of the evidence one or more aggravating factors necessary to increase the mandatory minimum hard 25 sentence to a hard 50. In the wake of *Alleyne*, we held this statutory procedure violated the Sixth Amendment. See *State v. Soto*, 299 Kan. 102, 119, 322 P.3d 334 (2014).

In response to *Alleyne* but before our decision in *Soto*, in September 2013, the legislature amended the hard 50 statute. The amended statute originally stated that "[t]he provisions of this subsection shall apply only to the crime of murder in the first degree based upon the finding of premeditated murder committed prior to the effective date of this act." K.S.A. 2013 Supp. 21-6620(c). The statute was subsequently amended to insert the effective date and change the subsection lettering. See K.S.A. 2014 Supp. 21-6620(e) ("The provisions of this subsection shall apply only to the crime of murder in the first

26

degree based upon the finding of premeditated murder committed prior to September 6, 2013.").

In general,

"'a statute operates only prospectively unless there is clear language indicating the legislature intended otherwise. *State v. Martin*, 270 Kan. 603, 608-09, 17 P.3d 344 (2001); *State v. Sisk*, 266 Kan. 41, 44, 966 P.2d 671 (1998). An exception to this rule has been employed when the statutory change is merely procedural or remedial in nature and does not prejudicially affect the substantive rights of the parties. *Martin*, 270 Kan. at 608-09; *State v. Ford*, 262 Kan. 206, 208, 936 P.2d 255 (1997).' *Wells*, 297 Kan. [741,] 761 [, 305 P.3d 568 (2013)]." *State v. Waller*, 299 Kan. 707, 718, 328 P.3d 1111 (2014).

Here, the amended statute explicitly provided that the new procedure should be considered procedural and applied retroactively:

"The amendments to subsection (e) by chapter 1 of the 2013 Session Laws of Kansas (Special Session):

"(1) Establish a procedural rule for sentencing proceedings, and as such shall be construed and applied retroactively to all crimes committed prior to the effective date of this act, except as provided further in this subsection." K.S.A. 2014 Supp. 21-6620(f).

"Article I, § 10, of the United States Constitution states simply that '[n]o State shall . . . pass any . . . ex post facto [l]aw.'" *State v. Todd*, 299 Kan. 263, 276, 323 P.3d 829, *cert. denied* 135 S. Ct. 460 (2014). There is no comparable provision in the Kansas Constitution. 299 Kan. at 276.

Relying on United States Supreme Court precedent, we have interpreted

"the prohibition on ex post facto laws to require two elements to be present: '(1) The law must be retrospective, applying to events occurring before its enactment, and (2) it must alter the definition of criminal conduct or increase the penalty by which a crime is punishable.' *Anderson v. Bruce*, 274 Kan. 37, 43, 50 P.3d 1 (2002)." *State v. Prine*, 297 Kan. 460, 469-70, 303 P.3d 662 (2013).

We have further stated:

"Although we have sometimes described the requirement of alteration in definition or increase in punishment in shorthand as mere '"disadvantage"' to a criminal defendant, see *State v. Chamberlain*, 280 Kan. 241, 247, 120 P.3d 319 (2005) (quoting *Stansbury v. Hannigan*, 265 Kan. 404, 412, 960 P.2d 227, *cert. denied* 525 U.S. 1060 [1998]), we have emphasized that the crucial 'question in evaluating an ex post facto claim is whether the [new] law changes the legal consequences of acts completed before its effective date.' *Prine*, 297 Kan. at 470 (citing *Weaver* [*v. Graham*], 450 U.S. [24,] 31[, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981)]; *State v. Armbrust*, 274 Kan. 1089, 1093, 59 P.3d 1000 [2002])." *Todd*, 299 Kan. at 278.

A merely procedural law does not "change[] the legal consequences of acts completed before its effective date" and therefore does not violate the Ex Post Facto Clause when applied retroactively. See 299 Kan. at 278 (citing *Collins v. Youngblood*, 497 U.S. 37, 49-50, 110 S. Ct. 2715, 111 L. Ed. 2d 30 [1990]); see also *Dobbert v. Florida*, 432 U.S. 282, 293, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977) ("Even though it may work to the disadvantage of a defendant, a procedural change is not ex post facto."). However, the legislature cannot simply declare a statutory amendment "procedural," thereby insulating later application of the changed law from ex post facto scrutiny. See *Todd*, 299 Kan. at 275 (citing *Collins*, 497 U.S. at 46).

Bernhardt argues that because the previous hard 50 statute was unconstitutional, the newly-amended statute "cannot be applied retroactively because it aggravates the crime of premeditated murder and it creates a greater punishment than the law allowed at the time of the commission of the crime." In his view, there was no hard 50 in effect when he committed his crime. Thus the amended statute, in essence, created a new, harsher punishment that cannot be applied to his long-ago-completed crime.

Bernhardt's argument ignores that it was not the hard 50 sentence, or the aggravating and mitigating factors used to determine its application, that the district judge held—and this court would later hold—unconstitutional; rather, it was the procedure for imposing the hard 50. The United States Supreme Court acknowledged the procedural nature of these types of statutes in *Alleyne* itself, when it said that the "force of *stare decisis* is at its nadir in cases concerning *procedural rules* that implicate fundamental constitutional protections." (Emphasis added.) *Alleyne*, 133 S. Ct. 2151 n.5.

We also note that the United States Supreme Court has rejected an argument similar to Bernhardt's in *Dobbert*, 432 U.S. 282. When defendant Ernest John Dobbert, Jr., committed the acts that led to his convictions for first- and second-degree murder, Florida's death penalty statutes required a person convicted of a capital crime to be sentenced to death unless a majority of the jury recommended mercy. Before Dobbert's sentencing, the statutory scheme was ruled unconstitutional under *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), and the state legislature amended the statutory procedure for imposing a death sentence. Dobbert was then sentenced under the amended statutory scheme. Based on the previous ruling on constitutionality, Dobbert challenged his death sentence under the Ex Post Facto Clause, arguing that there was no valid death penalty in effect at the time he committed the murders. The Supreme Court determined that this "highly technical" and "sophistic" argument

29

mocks the substance of the Ex Post Facto Clause. Whether or not the old statute would in the future, withstand constitutional attack, it clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers. The statute was intended to provide maximum deterrence, and its existence on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act of murder." *Dobbert*, 432 U.S. at 297.

Likewise, Bernhardt had fair warning at the time he murdered Kostner that he could be sentenced to a hard 50 term if he was ultimately convicted of premeditated first-degree murder. And, because the new statute did not alter the definition of criminal conduct or increase the penalty by which a crime is punishable, it cannot be said that "'the [new] law changes the legal consequences of acts completed before its effective date.'" *Todd*, 299 Kan. at 278 (quoting *Prine*, 297 Kan. at 470).

The district judge correctly determined that the amendments to K.S.A. 2013 Supp. 21-6620 could be applied to Bernhardt without violation of the Ex Post Facto Clause.

AGGRAVATING AND MITIGATING CIRCUMSTANCES

Bernhardt's final argument on appeal is that the district judge erred in his findings on the existence of aggravating and mitigating circumstances.

When reviewing a challenge to the sufficiency of the evidence to support a hard 50 aggravating circumstance, this court "consider[s] whether, after review of all the evidence in a light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance beyond a reasonable doubt." *State v. DeAnda*, 299 Kan. 594, 603, 324 P.3d 1115 (2014). When a district judge has declined to find a mitigating circumstance, "the standard of review is whether, after a review of all the evidence, viewed in a light most favorable to the defendant, a rational factfinder could

30

have found by a preponderance of the evidence the existence of the mitigating circumstance." *State v. Livingston*, 272 Kan. 853, 858, 35 P.3d 918 (2001).

The district judge found two aggravating circumstances: First, Bernhardt committed the crime in order to avoid or prevent a lawful arrest or prosecution, and second, Bernhardt committed the crime in an especially heinous, atrocious, or cruel manner. See K.S.A. 2015 Supp. 21-6624(e), (f). The judge also found one mitigating circumstance: Bernhardt did not have any significant criminal history. See K.S.A. 2015 Supp. 21-6625(a)(1).

Bernhardt challenges the district judge's finding that the crime was committed "to avoid or prevent a lawful arrest or prosecution." K.S.A. 2015 Supp. 21-6624(e). He also challenges the district judge's failure to find two mitigating circumstances: "The crime was committed while the defendant was under the influence of extreme mental or emotional disturbances," and "[t]he capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform the defendant's conduct to the requirements of law was substantially impaired." K.S.A. 2015 Supp. 21-6625(a)(2), (6).

Even if we were to assume the district judge committed all of these alleged errors in his findings, there was still abundant evidence to allow a rational factfinder to find beyond a reasonable doubt that Bernhardt murdered Kostner "in an especially heinous, atrocious or cruel manner" and that the existence of this aggravating circumstance was not outweighed by any of the mitigating circumstances at issue here. See K.S.A. 2015 Supp. 21-6620(e)(5); 21-6624(f). Bernhardt's heinous, atrocious, and cruel actions, previously detailed, need not be described again. And he does not contend that the presence of the additional mitigating factors would have outweighed the aggravator.

31

Regardless of whether there was error in findings on one aggravator and two mitigators, there is no reasonable possibility such an error affected the outcome of the sentencing phase of Bernhardt's trial. See *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

CONCLUSION

We have carefully examined each of defendant's claims on appeal and determined that they do not merit reversal of his conviction or vacation of his sentence. The judgment of the district court is affirmed.

* * *

JOHNSON, J., dissenting:  I disagree with the majority on two of the instruction issues. First, the district court's additions to the Pattern Instructions of Kansas (PIK) defining "premeditation" were contradictory and misleading. Second, an instruction on the lesser included offense of voluntary manslaughter was factually appropriate in this case and it was error for the trial court to refuse the defendant's request to give it. Moreover, I would not find the errors to be harmless, especially under the appellant's cumulative error claim.

*Premeditation*

My premeditation complaint in this case will principally focus on the language employed to define the term for the jury. But that does not mean that I have abandoned my previously expressed view of this court's temporal treatment of premeditation, to-wit:

"First, notwithstanding its majority view status in this State, I continue to reject the notion that a person can premeditate a murder while committing the murder. In my

32

view, concurrent premeditation is an oxymoronic concept that obliterates the distinguishing feature of first-degree premeditated murder. See *State v. Appleby*, 289 Kan. 1017, 1074-75, 221 P.3d 525 (2009) (Johnson, J., concurring in part and dissenting in part) (premeditation contemplates that the matter be thought over before commencement of homicidal conduct); *State v. Warledo*, 286 Kan. 927, 956, 190 P.3d 937 (2008) (Johnson, J., concurring) (premeditation requires having thought the matter over beforehand; 'beforehand' must mean prior to commencing the death-causing act)." *State v. Marks*, 297 Kan. 131, 151, 298 P.3d 1102 (2013) (Johnson, J., dissenting).

Here, the homicidal act entailed Bernhardt pulling Kostner from the car and onto the ground, kicking her from the waist to her head some 20 to 30 times, inflicting 6 distinct blows to the front of her head, and causing her death from multiple blunt force injuries. The majority's stated iteration of premeditation in this case is that it can "form *during* or *after* an initial altercation." (Emphasis added.) Slip op. at 18. In other words, the majority would permit the State to prove the premeditation element of the first-degree murder charge by proving either that: (1) Bernhardt thought about killing Kostner while he was kicking her; or (2) Bernhardt thought about killing Kostner after he had delivered the last kick. I submit that the notion that premeditation encompasses both concurrent-meditation (thinking about it while doing it) and post-meditation (thinking about it after it is done) does not comport with Black's Law Dictionary's definition of premeditation, which retains the temporal integrity of the term, to-wit: "Conscious consideration and planning that *precedes* an act (such as committing a crime); the pondering of an action *before* carrying it out." (Emphasis added.) Black's Law Dictionary 1371 (10th ed. 2014).

Nevertheless, the district court's modified instruction was so contradictory and misleading that a lay juror could not have clearly understood premeditation to mean either what the majority says it means or what I discern it should mean. To recap, the modified instruction stated as follows, with the first paragraph being the standard PIK instruction:

33

"'Premeditation' means to have thought over the matter beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life.

"Premeditation is the process of thinking about a proposed killing before engaging in homicidal conduct.

"Premeditation does not have to be present before a fight, quarrel, or struggle begins. Premeditation is the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned, contrived, or schemed beforehand.

"Premeditation can be inferred from other circumstances including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) dealing of lethal blows after the deceased was felled and rendered helpless.

"Premeditation can occur during the middle of a violent episode, struggle, or fight."

Certainly, the last sentence suggested to the jury that Bernhardt's premeditation could have occurred during the middle of the violent episode, which, according to Bernhardt's estimate, would have been somewhere around the 10th to 15th kick. But the PIK portion of the instruction clarified that to be a premeditated murder, the killer must "have formed the design or intent to kill *before the act*." (Emphasis added.) Then, the second paragraph defined the "act" referred to in the first paragraph as being the "homicidal conduct" and required the jury to find that Bernhardt had engaged in "the process of thinking about a proposed killing *before engaging in homicidal conduct*." (Emphasis added.)

34

Because the coroner told the jury that the cause of death was multiple blunt force injuries, a rational juror would have understood that the "homicidal conduct" referred to in the instructions meant the multiple kicks Bernhardt inflicted upon Kostner. Consequently, the first part of the instruction told that rational juror that Bernhardt *had* to form the intent to kill Kostner *before* he started kicking her. But the last sentence of the instruction contradicted that directive by telling the rational juror that Bernhardt *could* have formed the intent to kill Kostner in the middle of the homicidal conduct of kicking her. To that rational juror, then, the first and last parts of the instruction present an irreconcilable contradiction.

Similarly, the instruction's third paragraph might make sense to a nonlinear thinking juror, but for others, it would be mind-spinning, unintelligible gibberish. The paragraph begins by telling the jury that the defendant did not have to premeditate the killing before beginning a fight, quarrel, or struggle. Then, it explains that the defendant had to have time to reflect or deliberate on the killing. Perhaps those professing to be astute at multi-tasking would not be confused by the concept of taking time for reflection or deliberation while one is engaged in a fight, quarrel, or struggle. But even the multi-taskers would be scratching their heads about the notion that, after the defendant engaged in the "time of reflection or deliberation" on the killing, that does not necessarily mean that the killing was "planned, contrived, or schemed beforehand." How does one reflect or deliberate about killing the victim without planning, contriving, or scheming to kill the victim? If the defendant was not planning, contriving, or scheming to kill the victim, he or she was not premeditating the murder.

In my view, this is an example of what happens when various case quotes are taken out of context and thrown together as a jury instruction. The result is that the instruction fails the majority's test, which requires that the instruction "could not have

reasonably misled the jury." Slip op. at 14 (citing *State v. Horton*, 300 Kan. 477, 491, 331 P.3d 752 [2014]). Moreover, that misdirection denied Bernhardt a fair trial. See *Marks*, 297 Kan. at 156 (Johnson, J., dissenting) (fair trial requires jury be properly led to understand the concept of premeditation).

Before moving on to the next issue, I pause to observe that there seems to be nothing in the modified instruction which would have informed the jury that Bernhardt could have formed his intent to kill Kostner *after* the homicidal act of kicking was completed, as the majority suggests. The instruction paragraph referencing defendant's conduct after the killing simply informs the jury that what a killer does afterward might imply that the killer had thought the matter over *before* the killing. To the extent the majority suggests that letting the victim die without rendering aid, after inflicting the mortal wound, is tantamount to premeditating the killing, I do not understand that to be the law. Even under this court's interpretation of premeditation as being possible up to a nanosecond before an instantaneous killing, premeditation should no longer be a possibility after the point in time when the killing would be deemed instantaneous.

*Voluntary Manslaughter*

As I understand the majority's rationale for finding that a voluntary manslaughter instruction was not factually appropriate, it first determined that there was not a sudden quarrel because Bernhardt and Kostner started a verbal argument at the bar that continued on the ride home; an argument using mere words or gestures is insufficient provocation to support voluntary manslaughter; and the two often argued in that manner, making it foreseeable rather than sudden. Then, when "Kostner did slap Bernhardt," it merely evidenced that there was "an altercation between [the] parties," which was insufficient provocation standing alone. Slip op. at 24. I have a different view of both the facts and the legal principles.

36

The majority's characterization of Kostner's verbal attack as an oft-occurring, normal "argument" and calling her physical attack on Bernhardt a "slap" casts those facts in a light most favorable to the State. We have clearly stated that the opposite should be true. See *State v. Plummer*, 295 Kan. 156, 162, 283 P.3d 202 (2012) ("Of course, where the defendant has requested the lesser included offense instruction, the evidence should be viewed in the light most favorable to the defendant."). At trial, Bernhardt described a more provocative scenario: "She was yelling at me, she reached over and smacked me and I was driving and—I pulled over and pulled her over to—out of the driver's side by her hair and then she hit the ground and I started kicking her."

In addition, the majority conveniently ignores Bernhardt's immediate reaction to being yelled at and smacked while driving his vehicle, preferring instead to talk about his calculated—"not impulsive"—actions after the violent episode had ended. Slip op. at 25. His first reaction to being yelled at and smacked was to pull over his vehicle, grab his assailant by the hair, pull her past the steering wheel and out the driver's door onto the ground, where he commenced to kick her repeatedly "[p]retty much from her waist up," apparently in such a rage that he could not recall how many times he kicked her or whether he actually kicked her in the head. His response to being pressed on the number of times he kicked Kostner was: "20? 30? I don't know." One would certainly expect a person, who had coldly and callously formed the design or intent to kill a person by kicking them to death, to be more deliberate and calculating in the quality and placement of his kicks. Flailing wildly at the victim's body innumerable times, without regard for or memory of the location on the victim's body where the kicks landed, strikes me as a particularly incredible design for a premeditated killer to form.

From a legal standpoint, one could read the majority opinion as suggesting that it was necessary for Bernhardt to show there was a sudden quarrel to justify the voluntary

37

manslaughter instruction. But, as we have previously clarified, a sudden quarrel is but ""one form of provocation for 'heat of passion' and is not separate and apart from 'heat of passion.'"' *State v. Johnson*, 290 Kan. 1038, 1047, 236 P.3d 517 (2010) (quoting *State v. Coop*, 223 Kan. 302, 307, 573 P.2d 1017 [1978])." *State v. Story*, 300 Kan. 702, 711, 334 P.3d 297 (2014). We have defined heat of passion "to include ""any intense or vehement emotional excitement of the kind prompting violent and aggressive action."' [Citations omitted.]' *State v. Wade*, 295 Kan. 916, 925, 287 P.3d 237 (2012); see *State v. Story*, 300 Kan. 702, 711, 334 P.3d 297 (2014) (discussing definition of 'heat of passion'); *State v. Coop*, 223 Kan. 302, Syl. ¶ 1, 573 P.2d 1017 (1978) (heat of passion '"includes an emotional state of mind characterized by anger, rage, hatred, furious resentment, or terror"')." *State v. Brownlee*, 302 Kan. 491, 530, 354 P.3d 525 (2015), (Luckert, J., dissenting).

The majority was apparently impressed with the State's argument that Bernhardt did not specifically testify "'that he somehow snapped, experienced a break from reality, felt insulted, denigrated, or suffered a personal affront.'" Slip op. at 25. But in a manner, Bernhardt's testimony indicated those very things. He snapped and immediately pulled to the side of the road, rather than continuing to their residence. He had a sufficient break from reality that he couldn't remember exactly what happened—how many kicks he delivered or whether any landed on Kostner's head. He was in such an emotional state of mind that he kicked Kostner—his girlfriend—many, many times, continuing even after she stopped saying anything. If those facts are not indicative of anger, rage, hatred, and/or furious resentment, I am unsure what would qualify.

In my view, "[t]he crime of premeditated murder should be reserved for killings that are calmly planned or designed prior to the commencement of the murderous act, *i.e.*, murder in cold blood, rather than applied to crimes of passion, regardless of the amount of time that may be consumed by the killer's rage." *Marks*, 297 Kan. at 153 (Johnson, J.,

dissenting). In the legislature's view, a lesser included offense instruction is required "where there is some evidence which would reasonably justify a conviction of some lesser included crime." K.S.A. 2015 Supp. 22-3414(3). Here, there was evidence to reasonably justify a conviction for a heat of passion killing that was as credible, or more so, than the evidence of premeditation. Consequently, under our criminal justice system, the jury—not the judge—should have been permitted to decide which crime Bernhardt committed.

As the majority notes, Bernhardt asserted a claim that the cumulative effect of trial errors denied him a fair trial. I agree with that contention. The judge erred by giving the jury a misleading and contradictory instruction on premeditation and by refusing to give the requested instruction on heat-of-passion voluntary manslaughter as a lesser included offense. Given my inability to reasonably predict what the jury might have done with appropriate instructions on the law, I cannot say that the State has proved the instruction errors to be harmless. I would reverse and remand for a new trial with proper instructions.

* * *

LUCKERT, J., dissenting: I join Justice Johnson's conclusions that (1) the district court's modified premeditation instruction was so contradictory and misleading that a lay juror could not have clearly understood premeditation; (2) an instruction on the lesser included offense of voluntary manslaughter was factually appropriate in this case, and it was error for the trial court to refuse the defendant's request to give it; and (3) cumulative error requires reversal of Anson R. Bernhardt's conviction for premeditated first-degree murder.