NOT DESIGNATED FOR PUBLICATION

No. 119,625

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JASON DAVID FETTEROLF,
*Appellant*.

MEMORANDUM OPINION

Appeal from Grant District Court; CLINT B. PETERSON, judge. Opinion filed September 13, 2019.
Affirmed in part, reversed in part, and remanded with directions.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Jessica E. Akers*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., STANDRIDGE, J., and NEIL B. FOTH, District Judge, assigned.

PER CURIAM: Pursuant to a plea agreement, Jason David Fetterolf pled no contest
to one count each of unlawful cultivation or distribution of less than 1 gram of
methamphetamine, unlawful possession of drug paraphernalia, and criminal possession of
a firearm by a convicted felon. Before sentencing, Fetterolf filed a motion to withdraw
his plea. That motion was denied, and Fetterolf was sentenced to 60 months in prison.
Fetterolf appeals from both the denial of his motion to withdraw his plea and his
sentence. For the reasons stated below, we affirm in part, reverse in part, and remand
with directions.

1

FACTS

On June 16, 2017, Ulysses Police Officers Mark Ringer, Craig Hampton, and Ivan Rodriguez went to the home of Jason David Fetterolf. They were looking for Elizabeth Izzy Pruitt, a woman who had a warrant out for her arrest and who they knew had previously been at Fetterolf's residence. But when they arrived, Fetterolf told them that Pruitt was not there and had not been there for weeks. Through a crack in the door, Officer Ringer thought he saw a water pipe, which commonly was used to smoke illicit substances, on Fetterolf's kitchen table. He confirmed that suspicion when Fetterolf opened the door, stood aside, and invited the officers to come in and look for Pruitt. When they did, the officers saw a second pipe, this one commonly used for smoking methamphetamine, on the kitchen table next to the water pipe. They did not, however, find Pruitt.

Based on the two pipes, which the officers suspected were drug paraphernalia, the officers asked Fetterolf for consent to conduct a more thorough search of the residence. He originally said yes but then wavered. He ultimately became noncommittal when the officers asked him to sign a consent form. Not wanting to base their search on a questionable consent, the officers decided to detain Fetterolf, secure the scene, and obtain a search warrant. That warrant was granted and during the subsequent, more thorough search, the officers discovered:  the two glass pipes that originally were seen on the kitchen table, a white powdery substance that field tested as positive for 44.6 grams of Fentanyl, a crystal like substance that field tested as positive for 1.3 grams of methamphetamine, leafy green vegetation that had the raw odor of marijuana, a loaded .38 caliber revolver with extra ammunition, a Samsung cell phone, and other items—such as a scale and new plastic bags—that the officers believed commonly were associated with the distribution of narcotics. A later search of the cell phone and SD cards, which was conducted after a second warrant was obtained, revealed text messages, photos, and videos pertaining to drug trafficking.

2

On June 20, 2017, Fetterolf was served with a seven count complaint based on evidence obtained as a result of the two searches. That complaint later was amended on July 27, 2017, and charged Fetterolf with: (1) two counts of unlawful cultivation or distribution of controlled substances, both severity level 3 drug felonies; (2) one count of unlawful possession of drug paraphernalia, a severity level 5 drug felony; (3) one count each of criminal possession of a firearm by a convicted felon and unlawful use of a communication facility, both severity level 8 nonperson felonies; (4) one count of theft, a severity level 9 nonperson felony; (5) one count of no drug tax stamp, a severity level 10 nonperson felony; (6) one count of unlawful possession of drug paraphernalia, a class A nonperson misdemeanor; and (7) one count each of criminal use of a weapon and unlawful possession of controlled substances, hallucinogenic drug-first offense, both class B nonperson misdemeanors. After a preliminary hearing, the court found probable cause to bind Fetterolf over for trial. Fetterolf pled not guilty to all counts.

Before trial, Fetterolf entered into a plea agreement with the State. Under the terms of that deal, Fetterolf agreed to plead no contest to one count of unlawful cultivation or distribution of controlled substances, amended to be a severity level 4 drug felony, one count of unlawful possession of drug paraphernalia, a severity level 5 drug felony, and one count of criminal possession of a firearm by a convicted felon, a severity level 8 nonperson felony. In exchange, the State agreed to dismiss with prejudice the remaining counts. In addition, the State agreed it would not oppose Fetterolf's request for an own recognizance (OR) bond so that he could obtain surgery on a hernia that he claimed had been bothering him since his arrest almost eight months earlier.

A plea hearing was held on December 21, 2017. The parties orally reviewed the plea agreement with the district court at the hearing. The district court then conducted a plea colloquy with Fetterolf, during which it reviewed Fetterolf's rights. The court specifically addressed the jury trial rights that Fetterolf was giving up by entering a plea. The district court also questioned Fetterolf about any outside influences or promises that

3

may have been made to encourage him to enter into the plea agreement. The court confirmed with Fetterolf that his mind was clear and that he understood what he was doing. Finally, the district court reviewed the consequences of the plea and the potential sentences for each of the counts to which Fetterolf was agreeing to plead no contest. The State then provided a factual basis for the crimes charged. Satisfied with both the factual basis and Fetterolf's responses to the plea colloquy, the district court accepted his plea of no contest to unlawful cultivation or distribution of controlled substances, unlawful possession of drug paraphernalia, and criminal possession of a firearm by a convicted felon. The district court then considered Fetterolf's request to be released on an OR bond pending his sentencing hearing. The court expressed doubts as to the validity of Fetterolf's hernia claim. Specifically, the district court advised Fetterolf that it would require additional verification from a doctor before it would consider granting the OR bond. The matter was set for a status hearing on January 9, 2018. Fetterolf failed to provide any additional verification at that status hearing as requested so the district court denied his request for an OR bond.

Before sentencing, on February 8, 2018, Fetterolf filed a motion to withdraw his plea. In support of his motion, Fetterolf claimed: (1) He had a change of heart and wanted to go to trial, (2) he was a drug addict and needed help/treatment, and (3) he was bipolar and could not remember from day to day what he had said to counsel and others when he was in a manic state. The district court scheduled an evidentiary hearing for March 21, 2018, to consider the motion. Testifying on his own behalf, Fetterolf conceded that he lied about his hernia and only agreed to plead no contest so that he could get out on an OR bond, get high, and then kill himself. He also claimed that after the district court denied his request for an OR bond, he began reading "the law books" and decided that he wanted to be judged by his peers. Fetterolf testified he was a drug addict and needed inpatient services to treat his condition. Fetterolf also testified that he suffered from bipolar disorder, along with some other mental health issues, and that those issues caused him to suffer short-term memory loss. Fetterolf said that he remembered the

4

December 21, 2017 plea hearing but that he was "in a whole other world" in his head during the hearing and would "black out or something" when things that upset him were said.

Based on the evidence presented and the arguments of counsel, the district court denied Fetterolf's motion to withdraw his plea. After confirming that Fetterolf did not object or dispute that he had a criminal history score of A, the court sentenced him to a total of 60 months in prison.

ANALYSIS

On appeal, Fetterolf argues (1) the district court abused its discretion when it denied his motion to withdraw his plea and (2) the district court erred when it calculated his criminal history score at sentencing.

1. *Motion to withdraw plea*

We review the denial of a motion to withdraw a plea for an abuse of discretion. *State v. Macias-Medina*, 293 Kan. 833, 836, 268 P.3d 1201 (2012). A district court abuses its discretion if its action:

> "(1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

A trial court may, for good cause and at its discretion, allow a defendant to withdraw a guilty or nolo contendere plea at any time before sentencing. K.S.A. 2018

Supp. 22-3210(d)(1). In exercising its discretion, "the trial court should evaluate whether '(1) the defendant was represented by competent counsel, (2) the defendant was misled, coerced, mistreated, or unfairly taken advantage of, and (3) the plea was fairly and understandingly made.' [Citation omitted.]" *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006). Otherwise known as the *Edgar* factors, these considerations constitute a nonexclusive list, meaning that all of them "need not apply in a defendant's favor in every case, and other factors may be duly considered in the district judge's discretionary decision on the existence or nonexistence of good cause." *State v. Aguilar*, 290 Kan. 506, 513, 231 P.3d 563 (2009). Indeed, Kansas courts routinely caution against exclusive reliance on or mechanical application of the *Edgar* factors because doing so can improperly "transform the lower good cause standard of the statute's plain language into a constitutional gauntlet." 290 Kan. at 513; see *Macias-Medina*, 293 Kan. at 837.

We must address the question of whether a plea is understandably made in light of the constitutional and statutory rights that attach to a defendant's plea. *Edgar*, 281 Kan. at 36. To be constitutionally valid, guilty or no contest pleas, and their resulting waiver of rights, must not only be voluntary but must also "'be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" 281 Kan. at 36-37 (quoting *Brady v. United States*, 397 U.S. 742, 748, 90 S. Ct. 1463, 25 L. Ed. 2d 747 [1975]). A defendant must therefore, at a minimum, be informed of the nature of the charges, the constitutional rights that are waived when a guilty or no contest plea is entered in a criminal case, and the consequences of the plea. 281 Kan. at 37; see K.S.A. 2018 Supp. 22-3210(a). Further, a review of the consequences must include "the specific sentencing guidelines level of any crime committed on or after July 1, 1993, and of the maximum penalty provided by law which may be imposed upon acceptance of such plea." K.S.A. 2018 Supp. 22-3210(a)(2).

Fetterolf relies on the third *Edgar* factor—that his plea was not fairly or understandably made—to support his motion to withdraw plea. Specifically, Fetterolf

claims he did not understand or appreciate the ramifications and consequences of his decision to enter the plea because, at the time, his sole focus was on his attempt to obtain an OR bond. Fetterolf claims his lack of understanding was compounded by his drug addiction and mental health issues.

But Fetterolf's claim is not supported by the record. During the plea hearing, the district court informed Fetterolf of the nature of the charges and of the constitutional rights he was waiving upon his plea of no contest. The court also reviewed with Fetterolf the consequences of his plea and potential sentences for each count to which Fetterolf was agreeing to plead no contest. And Fetterolf's responses to the court's questions indicated that he understood the nature of the proceedings and was aware of what he was doing. The plea hearing transcript affirmatively shows Fetterolf entered his plea understandingly and voluntarily. And the judge was able to observe Fetterolf when he stated he understood the nature of the charge against him, the constitutional rights that he was going to give up with the no contest plea, and the consequences of his plea. See *State v. Schaefer*, 305 Kan. 581, 595, 385 P.3d 918 (2016) ("The district court had the opportunity to view Schaefer's affect and body language and assess whether he was truthfully and unequivocally answering those questions.").

Fetterolf also briefly argues that the plea colloquy itself was inadequate, particularly as it pertained to his drug addiction and mental health issues. Specifically, Fetterolf claims that the district court's inquiries into whether his mind was clear and whether he understood what they were doing did not go far enough to show that his drug addiction was not "driving his motivation to plead no contest." But a defendant's motivation or drive to enter a plea has no bearing on whether the plea was fairly, understandably, and intelligently made. See *Edgar*, 281 Kan. at 36-37.

Based on the discussion above, we find that Fetterolf was fully advised of the relevant circumstances and likely consequences of his decision to enter a plea. See

*Edgar*, 281 Kan. at 36-37 ("To be constitutionally valid, guilty pleas and their resulting waiver of rights . . . 'must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'"). As such, we conclude that the district court did not abuse its discretion when it found that Fetterolf failed to demonstrate the good cause necessary to justify the withdrawal of his no contest pleas. See K.S.A. 2018 Supp. 22-3210(d)(1).

2. *Criminal history score*

Fetterolf next argues that the district court erred when it classified his prior out-of-state conviction as a person felony and used it to calculate his criminal history score. Fetterolf did not object to his criminal history score at sentencing, but that does not preclude this court from exercising appellate review of this issue. See *State v. Dickey*, 301 Kan. 1018, 1034, 350 P.3d 1054 (2015) ("a legal challenge to the classification of a prior adjudication for purposes of lowering [a defendant's] criminal history score—can be raised for first time on appeal"). The "[c]lassification of prior offenses for criminal history purposes involves interpretation of the KSGA [Kansas Sentencing Guidelines Act]; statutory interpretation is a question of law subject to unlimited review. Whether a district court's application of the KSGA violated constitutional rights presents a question of law subject to unlimited review. [Citations omitted.]" *State v. Wetrich*, 307 Kan. 552, 555, 412 P.3d 984 (2018).

We begin our analysis by reviewing the statutory scheme in Kansas for calculating a defendant's criminal history score. See K.S.A. 2018 Supp. 21-6801 et seq. Under the KSGA, a district court must include all felony and misdemeanor convictions that occurred prior to the sentencing in the current case when determining a defendant's criminal history score. K.S.A. 2018 Supp. 21-6810(a), (c). That includes out-of-state convictions which are "classified as either a felony or a misdemeanor according to the convicting jurisdiction." K.S.A. 2018 Supp. 21-6811(e)(1)-(2). They are then classified as

person or nonperson crimes by referring to a comparable offense under the Kansas Criminal Code that is in effect on the date the current crime of conviction was committed. K.S.A. 2018 Supp. 21-6811(e)(3). "If the state of Kansas does not have a comparable offense on the date the current crime of conviction was committed, the out-of-state crime shall be classified as a nonperson crime." K.S.A. 2018 Supp. 21-6811(e)(3).

Although the 2019 Kansas Legislature made extensive amendments to K.S.A. 21-6811, it did not express any intent that those amendments should be construed or applied retroactively. See L. 2019, ch. 59, § 13. Furthermore, neither party argues that the 2019 amendments to K.S.A. 21-6811 should apply to this case. As such, we will not construe, apply, or otherwise address the 2019 amendments in this opinion. See *State v. Bernhardt*, 304 Kan. 460, 479, 372 P.3d 1161 (2016) ("In general, '"a statute operates only prospectively unless there is clear language indicating the legislature intended otherwise."'").

Kansas courts have long grappled with how to interpret the meaning of the term "comparable offenses" in K.S.A. 2018 Supp. 21-6811(e)(3). Beginning in *State v. Vandervort*, 276 Kan. 164, 179, 72 P.3d 925 (2003), our Supreme Court initially held that the offenses "need only be comparable, not identical," meaning that the Kansas statute that was the "closest approximation" to the out-of-state offense was a comparable offense. The *Vandervort* court also implicitly held that the comparison should be made with the Kansas statute in effect at the time the current crime of conviction occurred. 276 Kan. at 179. But a few years later, in *State v. Williams*, 291 Kan. 554, 562, 244 P.3d 667 (2010), and then again in *State v. Murdock*, 299 Kan. 312, 316, 323 P.3d 846 (2014) (*Murdock I*), our Supreme Court overruled the implicit ruling from *Vandervort* and held that "[t]he comparable Kansas offense should be determined as of the date the out-of-state offenses were committed."

9

Presumably in response to our Supreme Court's decisions in *Williams* and *Murdock I*, the Kansas Legislature amended K.S.A. 21-6811(e) in 2015 to clarify that the classification of prior out-of-state convictions as person or nonperson crimes must be based on the comparable Kansas offense in effect when the crime of current conviction was committed. See L. 2015, ch. 5, § 2(e). The Legislature also expressed its intent that the amendment was procedural in nature and therefore should be construed and applied retroactively. L. 2015, ch. 5, § 2(j). Subsequently, in *State v. Keel*, 302 Kan. 560, 590, 357 P.3d 251 (2015), our Supreme Court overruled its decisions in *Williams* and *Murdock I*, and held, based in part on the Legislature's amendments to K.S.A. 21-6811(e), that "the classification of a prior conviction or juvenile adjudication as a person or nonperson offense for criminal history purposes under the KSGA is determined based on the classification in effect for the comparable offense at the time the current crime of conviction was committed." But through all of these changes, the court continued to define a "comparable offense" using the "comparable, not identical" or "closest approximation" approach. See, e.g., *Murdock I*, 299 Kan. at 314; *Vandervort*, 276 Kan. at 179.

That changed in 2018 when our Supreme Court decided *Wetrich* and held that "constitutional constraints would require that, to be a comparable offense, a prior out-of-state crime must have identical or narrower elements than the Kansas offense to which it is being compared." 307 Kan. at 557.

Subsequent decisions have cut off the retroactive application of *Wetrich* by classifying it as a change in law. See *State v. Weber*, 309 Kan. 1203, 1209, 442 P.3d 1044, 1049 (2019) (explicitly holding that "*Wetrich* was a change in the law"); *State v. Newton*, 309 Kan. 1070, 442 P.3d 489, 491-92 (2019) (implying that *Wetrich* was a change in the law). But those decisions are inapplicable to our analysis because Fetterolf was sentenced almost two weeks after the *Wetrich* decision was issued. See *State v. Murdock*, 309 Kan. 585, 591, 439 P.3d 307 (2019) (*Murdock II*) ("The legality of a

10

sentence is fixed at a discrete moment in time—the moment the sentence was pronounced. At that moment, a pronounced sentence is either legal or illegal according to then-existing law."). Moreover, Fetterolf challenges the calculation of his criminal history score on direct appeal. As our Supreme Court recently stated in *Murdock II*, 309 Kan. at 591-92:

> "Here, we pause to note that today's holding does not disturb our longstanding rule that in a direct appeal, a defendant will receive the benefit of any change in the law that occurs while the direct appeal is pending. See, e.g., *State v. Ford*, 302 Kan. 455, 471, 353 P.3d 1143 (2015) ('[I]t is generally true that changes in the law apply prospectively and only to cases on direct review.'). To the extent our prior caselaw confused the procedural mechanism of a direct appeal with a motion to correct an illegal sentence, we now clarify the distinction. Put simply, a party may seek and obtain the benefit of a change in the law during the pendency of a direct appeal, but a party moving to correct an illegal sentence is stuck with the law in effect at the time the sentence was pronounced. Because existing precedent dictates this outcome, we need not decide whether K.S.A. 2018 Supp. 22-3504(3) applies retroactively."

Even K.S.A. 2018 Supp. 22-3504(3) as revised under S.B. 18 and enacted on May 23, 2019, states: "'Change in the law' means a statutory change or an opinion by an appellate court of the state of Kansas, unless the opinion is issued *while the sentence is pending an appeal from the judgment of conviction*." (Emphasis added). L. 2019, ch. 59, § 15(c)(2).

Because this is a direct appeal, Fetterolf gets the benefit of any change in the law—in this case the holding in *Wetrich*—while his appeal is pending. See *Murdock II*, 309 Kan.at 591-92. But even if it was not a direct appeal but instead was a collateral attack seeking to correct an illegal sentence under K.S.A. 22-3504, we still would analyze Fetterolf's claim using the legal principles set forth in *Wetrich* because Fetterolf was sentenced almost two weeks after the *Wetrich* decision was issued.

Having determined the applicable law, we now turn to Fetterolf's claim that the district court erred in classifying his prior out-of-state conviction as a person felony for purposes of calculating his criminal history score. On the day Fetterolf was sentenced, K.S.A. 2017 Supp. 21-6811(e) required the court to classify a prior out-of-state conviction as a person or nonperson offense by looking to see if the Kansas Criminal Code had a comparable offense at the time the defendant committed the current crime of conviction. See *Keel*, 302 Kan. at 590. If there was no comparable offense in Kansas at the time the defendant committed the current crime of conviction, the out-of-state conviction was to be classified as a nonperson offense. If Kansas did have a comparable offense at the time the defendant committed the current crime of conviction, the district court was required to refer to that comparable offense in Kansas in deciding whether to classify the prior out-of-state conviction as a person or nonperson offense. And under the legal principles set forth in *Wetrich*, an out-of-state conviction is comparable to an offense under the Kansas Criminal Code if the elements of the out-of-state crime are identical to, or narrower than, the elements of the Kansas crime to which it is being referenced. 307 Kan. at 562.

The district court calculated Fetterolf's criminal history score to be A based, in part, on a 2003 Texas conviction for indecency with a child that the court classified as a person offense. To determine whether the district court erred, we must compare the elements of that offense with the Kansas statute in effect on the date that the current crime of conviction occurred to determine whether they are identical to or narrower than the Kansas offense. See *Wetrich*, 307 Kan. at 562. Fetterolf's Texas conviction was in violation of Tex. Penal Code Ann. § 21.11 (2001), which provided, in relevant part:

> "(a) A person commits an offense if, with a child younger than 17 years and not the person's spouse, whether the child is of the same or opposite sex, the person:
> (1) engages in sexual contact with the child or causes the child to engage in sexual contact;

12

. . . .

"(c) In this section, 'sexual contact' means the following acts, if committed with the intent to arouse or gratify the sexual desire of any person:

(1) any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child; or

(2) any touching of any part of the body of a child, including touching through clothing with the anus, breast, or any part of the genitals of a person."

By contrast, the most comparable Kansas offense at the time the current crime of conviction occurred was indecent liberties with a child in violation of K.S.A. 2016 Supp. 21-5506(a):

"(a) Indecent liberties with a child is engaging in any of the following acts with a child who is 14 or more years of age but less than 16 years of age:

(1) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both; or

(2) soliciting the child to engage in any lewd fondling or touching of the person of another with the intent to arouse or satisfy the sexual desires of the child, the offender or another."

As Fetterolf correctly notes, the Texas statute is broader because it applies to victims that are not covered by the Kansas statute, namely individuals that are 16 years of age. Compare Tex. Penal Code Ann. § 21.11 with K.S.A. 2016 Supp. 21-5506(a). Therefore, the district court erroneously classified Fetterolf's prior Texas conviction as a person felony. See K.S.A. 2018 Supp. 21-6811(e)(3); see also *Wetrich*, 307 Kan. at 562 (out-of-state conviction is comparable to offense under Kansas Criminal Code only if elements of out-of-state crime are identical to, or narrower than, elements of Kansas crime being referenced). The State concedes this point and, as a result, we reverse and remand this case for resentencing using the proper criminal history score.

Affirmed in part, reversed in part, and remanded with directions.