NOT DESIGNATED FOR PUBLICATION

No. 125,760

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

THOMAS WOJTCZUK,
*Appellant*.

MEMORANDUM OPINION

Appeal from Rooks District Court; THOMAS J. DREES, judge. Submitted without oral argument. Opinion filed May 17, 2024. Affirmed.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Ryan J. Ott*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before HILL, P.J., SCHROEDER, J., and MARY E. CHRISTOPHER, S.J.

PER CURIAM: Thomas S. Wojtczuk was charged with intentional second-degree murder and criminal possession of a firearm by a convicted felon for allegedly shooting and killing his wife, Charity Northrop, on April 8, 2020, in Rooks County, Kansas. Wojtczuk pleaded guilty to the criminal possession charge and proceeded to trial on the remaining charge. The jury found Wojtczuk guilty of intentional second-degree murder. On appeal, Wojtczuk contends: (1) the trial court erred by instructing the jury on reckless second-degree murder as a lesser included offense; (2) the prosecutor committed error by arguing the jury could not consider voluntary manslaughter if it found the State met its burden to prove intentional second-degree murder; (3) the trial court erred by informing

1

jurors that a trial is expensive and inconvenient; (4) the trial court erred by instructing jurors on reckless second-degree murder as a lesser included offense of intentional second-degree murder; and (5) cumulative errors deprived him of a fair trial. However, Wojtczuk moved to withdraw Issues III and IV. No response was filed by the State, and Wojtczuk's motion is granted. After thorough review of the briefs and record, this panel finds no error and affirms his conviction.

FACTUAL AND PROCEDURAL HISTORY

Charity was shot and killed on April 8, 2020. Shortly thereafter, the State charged Wojtczuk with intentional second-degree murder, a severity level 1 person felony; and criminal possession of a firearm by a convicted felon, a severity level 8 nonperson felony. On October 4, 2021, Wojtczuk pleaded guilty to criminal possession of a firearm by a convicted felon.

A trial was held from May 31 through June 7, 2022, on the charge of intentional second-degree murder. Many witnesses testified or were mentioned in the testimony of others, and their names and relation to this case are summarized below:

- Charity Northrop: victim
- Ben Larson: Deputy with the Rooks County Sheriff's Office
- Nathaniel Herbel: Charity's future son-in-law
- Dakota Drullinger: Charity's son
- L.D.: Charity's son
- B.D.: Charity's daughter
- Leona Drullinger: Charity's mother
- Alaina (last name unknown): Charity's daughter
- Brad Lynch: Leona Drullinger's boyfriend
- Dyllan Lynch: Brad Lynch's son

2

- Tamara Drullinger: Charity's sister-in-law
- Kelsey Blackman: Charity's older sister
- Victoria Jones: Charity's niece
- Samantha Smith: Charity's cousin
- Jessie Goodenow: Deputy with the Rooks County Sheriff's Office at the time of the crime
- Jay Wessel: KBI Forensic Scientist
- Dr. Lyle Noordhoek: pathologist and Rooks County Coroner
- Dustin Snodgrass: KBI special agent
- Mackenzie Garcia: KBI firearms and tool mark examiner
- Tim Beckham: KBI senior special agent
- Trevor Christenson: KBI forensic scientist, trace evidence section
- Lisa Burdett: KBI forensic science supervisor and forensic biologist
- Verla King: KBI criminal intelligence analyst supervisor
- Collin Hockett: Rooks County Sheriff's Office, patrol supervisor lieutenant.

Deputy Ben Larson with the Rooks County Sheriff's Office testified that at about 11:46 p.m. on April 8, 2020, he responded to a dispatch to a residence in Woodston with a report that a female was having trouble breathing and may have been shot in the chest. When Deputy Larson arrived at the residence, Nathaniel Herbel and Dakota Drullinger led him to the garage. Once inside, Deputy Larson testified he went up some stairs toward a makeshift loft in the garage and saw Brad Lynch directly in front of him standing by a mattress. To the deputy's right was Leona Drullinger hunched over Charity on the mattress, and there was a firearm to the deputy's left. Deputy Larson testified that he first saw Wojtczuk while going up the stairs to the loft and that Wojtczuk was on the ground level asking if the woman was ok. Deputy Larson stated that when you go up the stairs to the loft, you have to crawl into the area with the mattress and that there was not enough room at the top of the stairs to stand up fully without hitting your head at the top. Deputy Larson testified he had Lynch and Drullinger exit the loft, EMS personnel went

up the stairs and pronounced Charity as deceased, and he then secured the scene. The State offered Deputy Larson's bodycam footage, the district court admitted it into evidence, but that footage was not provided on appeal.

Tamara Drullinger, sister-in-law of Charity, testified that they had a good relationship. Tamara said Charity was worried about Wojtczuk's drinking and controlling behavior. Tamara explained that Wojtczuk did not like Charity having contact with other men, he was worried about pictures on Charity's phone, and he wanted to know what Charity was doing all the time, but Charity tried to brush it off like it was no big deal. Charity told Tamara that she was seeing only Wojtczuk. She explained that Wojtczuk and Charity initially planned to get married in the Summer of 2020, but when the pandemic hit, they rescheduled and were married on April 5, 2020.

Tamara testified about a trip to Hays in March 2020, when she and Charity were returning a few wedding items that were no longer needed. When Charity realized she had forgotten her phone at home, she told Tamara she was worried that Wojtczuk would go into her phone and delete her contacts and a photo of Charity's youngest son as a newborn with his father. She told Tamara that she and Wojtczuk had argued about whether she would delete the photo because it was of another man on her phone. Tamara said that Charity told her Wojtczuk was controlling and did not want her to talk to people he did not know and that he got jealous about things that happened before they got together. During the trip to Hays, Wojtczuk called and texted Charity several times on Tamara's phone. Charity told Tamara she was worried Wojtczuk would run out of alcohol. Charity expressed to Tamara that if Wojtczuk ran out of alcohol, he got upset easily about little things, bad things would happen, and things would get broken.

Kelsey Blackman testified Charity was her older sister by two years and that they were close. She explained that in March 2020, Wojtczuk, Charity, and Charity's kids came to Nebraska to visit Kelsey and stayed for a couple weeks. While they were there,

4

Kelsey said she observed Charity and Wojtczuk fighting, yelling, and arguing about money and who Charity was or was not talking to. Kelsey said that Wojtczuk would become upset, would take Charity's phone and go through it, and he was going crazy.

Victoria Jones testified Charity was her paternal aunt, and about a week before the wedding in April 2020, she moved in with Charity in Woodston. In that week, she said that Charity and Wojtczuk kept to themselves and were usually quiet, except for the day Charity died. Victoria testified that on the morning of April 8, she heard Wojtczuk and Charity yelling in their room; that Charity was angrier and more emotional than usual; and that when Victoria tried to talk to Charity, she told Victoria to leave her alone. Victoria denied knowing what they were fighting about and stated on cross-examination that this was the only time she had witnessed them fighting.

Victoria said that, on the evening of April 8, she left the house to go cruising in the truck with her Grandma Leona, Brad Lynch, and Dyllan Lynch. Victoria testified that before they left, Charity had been in her bedroom in the house and she had not seen Wojtczuk since earlier in the day when he went to the garage. When they got back to the house, Victoria and Dyllan went inside while Brad and Leona talked in the truck. Soon after entering the house, Victoria said Wojtczuk entered through the garage door yelling, "'Somebody help, somebody help. Aunt Charity, she shot herself, somebody help. Call an ambulance.'" Victoria testified that Wojtczuk was going ballistic, there was blood on his hands, and she had never seen Wojtczuk panic like that before.

Dyllan Lynch testified that on April 8, he went to Woodston around 5 p.m. to see his father and Leona at the house where Charity was living. Dyllan testified this was the first time he met either Charity or Wojtczuk. Later in the evening, when they had gone back inside and were hanging out, Dyllan testified that Charity came into the room and was on a video chat with one of her friends. Dyllan recalled Charity saying he was a cute single guy and called him a "hottie." Charity then said, "'I got a couple hot guys over here

5

that I want you to meet,'" and she brought the phone to Dyllan and introduced him to her friend. Dyllan recalled that later Wojtczuk "seemed irritated, not wanting to be around me and the kids or anyone in the living room," and Dyllan thought it was due to the hottie comments.

Dyllan testified that about 30-45 minutes after Charity made the hottie comments, he, Brad, Leona, and Victoria went driving around town and were gone for about 30-45 minutes. When they got back to the house, Dyllan and Victoria went inside. He recalled that the children were in the living room listening to music and watching TV. Dakota, one of the children, stopped the TV and asked, "'[D]id you guys hear that?'" Dyllan denied that he heard anything. Then they "heard the back door from the garage fly open, and [Wojtczuk] came running in, slid on his knees and said, 'She shot herself.'" On redirect, Dyllan testified that Wojtczuk's reaction was not what he would expect, he had a feeling that something was wrong, and he did not think Charity would have done this. Dyllan said Breanna, another child, had his phone and called 911.

Samantha Smith, Charity's cousin, recalled that in the week leading up to her marriage to Wojtczuk, Charity was distant and was not her goofy self, but Smith denied that Charity confided in her. Smith testified that on April 8, Charity messaged her saying, "'Got a hottie I think you might like.'" Later that same day, Smith and Charity spoke via Facebook Messenger video call, and Charity told Smith about Dyllan. At some point Charity turned the video to Dyllan to show his face, and they said hello. Smith stated that during their call, Charity was not her usual loud, talkative, and goofy self and that she was instead quieter. On cross-examination, Smith stated that Charity had told her of some fights with Wojtczuk, but denied they were anything unusual.

Brad Lynch testified that his mother and Charity set him up with Charity's mother, Leona Drullinger, and he was invited to Charity's wedding to meet Leona for the first time. Brad testified at the wedding on April 5, he spoke to Wojtczuk in the backyard and

then walked Charity down the aisle. Brad spent time with Leona at the wedding, and they arranged to meet again on April 8 for their first date.

On April 8, Brad arrived at Charity's house sometime around 5:30 p.m. He denied noticing anything unusual between Wojtczuk and Charity. While he waited for Leona to arrive, he said they were sitting in the living room when Charity pointed her phone camera at him and Dyllan and told the person she was talking to that "'[w]e have a couple of hotties here.'" He said Charity pointed the phone at Dyllan, "and that was that." Brad said Wojtczuk was sitting against the door to the office drinking vodka and chasing it with tequila, and Wojtczuk said, "'I'm just the poor, big, dumb, bald Polack.'" Brad speculated that Wojtczuk was feeling depressed or insecure, but everything seemed fine until Wojtczuk disappeared and Brad no longer saw Charity. Then, "one of the kids came in and said they were arguing in the garage."

Brad said he went to the garage and could hear voices and saw Charity and Wojtczuk "standing there face to face having kind of a heated, verbal conversation." Brad then approached them, and they told him the fight was "about a picture of an ex-boyfriend [Wojtczuk] wanted her to delete from her phone, and her viewpoint was she wanted to keep the photo long enough to blow it up as the boyfriend was holding a baby." Brad understood the baby was Charity's and that "she didn't mind getting the boyfriend out of the picture, but she wanted to keep the picture of the baby." Brad stated that Wojtczuk was angrier than Charity. Brad talked to them, and ultimately they decided that Charity would keep the picture long enough to get it enlarged for the baby photo and then would delete it from her phone. Brad confirmed this solution seemed to satisfy both parties because they calmed down. Brad then held Charity and Wojtczuk's hands and said a quick prayer for them. At that point Leona arrived, and Brad followed her back inside. Leona asked him if everything was ok, and Brad responded, "'For now. I feel like something more is coming.'"

7

Brad wanted to talk to Leona and have some privacy, so he invited her to go for a drive. Dyllan and Victoria jumped in the backseat of Brad's truck and came with them. When they got back, about 45 minutes later at around 11:45 p.m., Victoria and Dyllan got out while he and Leona stayed in the truck. Brad and Leona were talking and listening to music, and as another song started to play, they heard a loud gunshot come from the garage. Brad had some experience as a law enforcement officer, and he thought the sound was "probably a shotgun or a high power rifle." Brad told Leona to stay in the truck, and when he opened the truck door to step out, Wojtczuk came out of the garage's side door. Brad walked toward Wojtczuk, and Wojtczuk put his hands up to his head and was saying "'[n]o, no, no.'" Brad denied seeing him crying or seeing any blood.

Brad testified he went into the garage as Wojtczuk was walking away, and Brad then ran up the makeshift stairs to the loft. In the loft, Brad saw Charity at the foot of a mattress with one leg folded under her, laid back with her torso turned and her head turned furthest away from him. Brad denied anyone else was in the loft. He leaned over Charity to see if he could render any aid, but he believed she was deceased because of the massive wounds to her chest and she was not moving. Brad heard Leona coming up the steps and tried to stop her, but she made it up the stairs. Leona started sobbing and picked up Charity and held her close. While Leona held Charity, Brad knelt down next to Leona's feet facing the stairway in case anybody tried to come up. He did not want anyone to damage the crime scene or for the children to see. Brad called 911. A copy of that call was entered into evidence but was not provided on appeal. When the prosecutor asked Brad who he was talking to when he said "'get back'" or "'stop'" in the 911 call, Brad replied that Wojtczuk tried to come into the loft a couple times and that Wojtczuk was arguing with Leona. Brad said Leona wanted Wojtczuk to go back into the living room and did not want him around.

While he was in the loft, Brad saw a single barrel firearm. He said that he took photos of the scene when Wojtczuk started to come up the stairs. None of the

photographs Brad took of the loft were provided on appeal, though they were admitted at trial. Brad denied that he or anyone else touched the gun. Rather, the only thing that was altered was Charity's body because Leona was cradling her daughter. After EMS arrived, Brad and Leona left the loft and went inside the house. Brad testified he saw Wojtczuk in the living room on the pullout couch, holding his head in his hands, and it appeared he was trying to cry but no tears were coming out. Brad said Wojtczuk made a comment like, "'She shot herself,'" or something like that.

Jessie Goodenow, a Deputy at the Rooks County Sheriff's Office at the time of the crime, testified that on April 8, he was dispatched to backup Deputy Larson on a call for an individual with a gunshot wound. Officer Goodenow testified he arrived at the house at about 12:05 or 12:10 a.m. on April 9 and found Deputy Larson in the garage loft with two other people. Officer Goodenow testified he is 5 foot 4 inches tall and could not completely stand up in the loft area. He saw the shotgun on the opposite end of the loft from Charity's body and denied he touched it. He stated that EMS personnel determined Charity was dead. The State offered Officer Goodenow's bodycam footage into evidence, the district court admitted it, and it is provided on appeal.

Officer Goodenow first interviewed Wojtczuk when he was sitting in the living room of the house on the pullout couch. Officer Goodenow's bodycam footage from that interview was admitted into evidence, and it is provided on appeal. In the footage, Officer Goodenow asked Wojtczuk what happened, and Wojtczuk responded that he was cooking steaks, he brought one to Charity in the loft, and he was going back down the steps to get their cigarettes when he heard an explosion. He said he did not even see the shotgun, and then he looked around the room at the others and asked where it was. Wojtczuk said Charity was bleeding and that she said "help." He put his hand on her chest, and "it was just flesh." Wojtczuk said he was "screaming and yelling," and a girl in the video said no one heard him and another girl responded that she did. Wojtczuk said that was all he

9

knew. Officer Goodenow testified that he later detained and placed Wojtczuk in his vehicle and placed bags on Wojtczuk's hands to protect potential evidence.

The district court gave an instruction to the jury notifying it that Leona Drullinger, Charity's mother, testified previously in this case but had passed away. The State had the transcript of Leona's testimony read into the record. Leona said the house where the shooting occurred belonged to her and her late husband, but Charity, her children, and Wojtczuk began living there in January or February 2020. Leona arrived at the house in Woodston on April 8 between 5 and 7 p.m. with her grandson, Dakota. When she arrived, Leona said Charity and Wojtczuk were in the garage with Brad, and Leona heard Wojtczuk telling Charity how jealous he was and that Charity was crying. Leona said later they were holding hands with their heads bowed like they were praying, and it was calm.

Leona was talking to Charity about 30 minutes later, and Charity was a little upset and hurt about the disagreement she had with Wojtczuk. Charity explained that Wojtczuk was upset and jealous due to the photo of her infant son and ex-husband, and Wojtczuk accused Charity of cheating on him. Leona stated that the child in the picture was about to turn 12 years old and that it was an old photo. Charity told Leona that Wojtczuk wanted to leave her. Leona told her to just let him go because he will be back. Charity then gave her a big hug. Leona said that Charity told her about repeated arguments with Wojtczuk because "he was constantly accusing her of seeing other guys and cheating on him."

Leona stated that about 30 or 45 minutes after the conversation with Charity, she went driving with Brad, Dyllan, and Victoria, and they were gone about an hour. When they got back to the house, Leona testified she and Brad stayed in the truck. Leona then heard a gunshot, looked at Brad, and told him, "'That sounded like a gunshot.'" Leona said that she saw Wojtczuk come out of the garage, and he had his hands up and was

10

hitting his head saying "'no, no.'" Brad went into the garage, and Leona went in through a different door. When she saw Brad's face, she knew something was not right and went to the loft. In the loft, Leona testified she saw Charity lying on her side on the bed with her right arm up, left arm down, and her face halfway on the pillow. Leona stated that Charity was still breathing, and she rolled Charity into her arms and saw a wound in her chest bigger than her fist. While holding her daughter, Leona testified she saw the gun on the other side of the loft and it was "[l]ike someone had thrown it over that way."

Leona testified that at some point she, Brad, and Wojtczuk were in the loft, and Wojtczuk was saying Charity shot herself. Leona said she looked at Wojtczuk and said, "'There's no way. She did not shoot herself, not with a shotgun.'" Leona was upset with Wojtczuk because she had told him not to touch the guns in the house, and he said he felt better having one next to the bed in case he needed it.

Tracie Allen, an agent with the KBI, testified that she was called to the scene of the shooting on April 9. When she arrived, she went up the wooden stairs to the loft in the garage where she saw Charity on a twin bed in the north part of the loft. She stated that the loft wall to the connecting ceiling was about 4 feet, the floor of the loft to the ceiling was about 5.3 feet due to the sloped roof, and the loft measured about 24 feet from north to south covering part of the garage. On the south end of the loft, opposite from Charity, Allen said she saw a bottle of vodka with a small amount of liquor in it, an electronic tablet, a hammer, and a Savage Arms Model 95 single shot 12-gauge shotgun. She stated the gun was 3 feet 10 inches long in total and was 2 feet 8 inches long from the end of the barrel to the trigger. On cross-examination, Allen testified that the base of the mattress was approximately 8 feet from the end of the firearm. After Allen initially denied seeing a steak on the heater in the loft area, defense counsel showed her a photo, which she confirmed was of a steak on the space heater in the loft. She did not think they located the steak in the photo.

11

Allen testified that she used swabs to collect potential DNA from the firearm's muzzle, wooden stock, and trigger. In swabbing the firearm, Allen explained, the focus is on common areas of contact where someone's hand would hold the firearm. She denied swabbing the trigger guard and testified she would have swabbed only the trigger where the finger makes contact.

Allen also testified they collected a men's Carhartt jacket from the garage floor that had been turned inside out and, when turned right side out, had red-brown stains on the jacket and sleeves. The jacket was found near the door leading from the garage into the house, which Allen confirmed was also near the base of the loft stairs. Allen testified they collected bloodstains from the loft and inside the house in the living room, kitchen, and bathroom sink. Allen stated that the presumptive test used on the suspected bloodstain in the kitchen was positive, indicating the stain was most likely human blood.

*Autopsy*

Dr. Lyle Noordhoek testified that he is a pathologist and coroner, and he conducted an autopsy of Charity. He testified that Charity had a gaping wound in her chest starting to the right of her sternum and extending to the top part of her right breast. Dr. Noordhoek testified this was a close-range shotgun blast. There was no trauma to the neck, face, nose or eyes, or lower parts of the body. Internally, Dr. Noordhoek discovered that her lung was shredded on the right side, and there were injuries to her diaphragm and right side of her liver. He confirmed that the liver is lower in the body than the breast. When asked how damage to the liver was caused when the injury was to the chest, Dr. Noordhoek explained: "In order for that to happen, the wound track has to be coming from right to left and from above towards the feet. So on an angle, and then down in the body." Referring to photos that were not provided on appeal, Dr. Noordhoek testified that he used a rod to indicate the path of injury from left to right and at a downward angle.

12

Dr. Noordhoek also testified that Charity's injuries indicated the shotgun was close to the body but not in direct contact, and a bruising pattern under her right arm meant her right arm was down when she was shot. Further, Dr. Noordhoek stated that Charity's left hand had a C-shaped singe on the outside left palm, indicating her hand was very close to the barrel of the shotgun. Her left hand also had a tearing injury from the middle of her left palm to below the left thumb, indicating her hand was up and across her body so that the injury continued from the side of her hand into her right chest. Dr. Noordhoek confirmed that he believed the injury to Charity's left hand was due to defensive shielding.

Although he had initially been told that Charity shot herself, Dr. Noordhoek testified she could not have shot herself. He measured the distance from Charity's shoulders to hands on both arms as 22-24 inches, and the length of the shotgun from barrel to the trigger was 32 inches. As a result, he testified that "she could not get her fingers into the trigger." Dr. Noordhoek also testified that Charity did not die immediately, her death was a homicide, and she could not have committed this act herself.

*Investigation*

Jay Wessel, a forensic scientist in the KBI's latent print section, examined the 12-guage shotgun in this case. Wessel testified there were not sufficient latent prints on the shotgun and explained the factors that impact whether a print is left after touching an item. On cross-examination, Wessel denied that the lack of prints on the shotgun was because it had been wiped down.

Dustin Snodgrass, a special agent for the KBI, testified that he investigated Charity's death. He responded to the Rooks County Sheriff's Office and photographed Wojtczuk there. Agent Snodgrass did not observe blood stains on Wojtczuk's hands, but

13

he did observe what appeared to be blood on Wojtczuk's left pant leg. On cross-examination, Agent Snodgrass said he observed wounds to the top of Wojtczuk's head and to the base of his right thumb. On redirect examination, Agent Snodgrass explained these "wounds" were scratches.

*Firearm Examination*

Mackenzie Garcia, a firearms and tool mark examiner with the KBI, testified that she received a shotgun for examination in this case. Using the firearm, Garcia demonstrated how a person would cock the hammer and then pull the trigger to release the hammer and hit the firing pin. She stated the hammer must be cocked for the trigger to be engaged and that nothing will happen if you pull the trigger without cocking the hammer. Garcia said the KBI conducts a trigger pull test on firearms in which they determine how much force is required to pull the trigger. If the trigger requires less than 2 pounds of pressure, then it is considered a safety hazard. In this case, the shotgun trigger would not release with 2 pounds of pressure, meaning it requires more than 2 pounds of pressure to release the trigger. Garcia test fired the firearm three times, and it performed as expected.

On cross-examination, Garcia testified that the shotgun has a safety mechanism that engages when the hammer is cocked. If the hammer is cocked and the trigger is jostled or the firearm is dropped, the hammer falls to a safety intercept notch instead of falling all the way forward to hit the firing pin. Garcia denied that the KBI drops firearms to test this function, but she confirmed that they jostle the trigger to test the safety function. On redirect, Garcia clarified that to conduct the jostling test, she cocks the hammer back and uses a mallet to lightly bang or strike the hammer to see if it will fall into the safety intercept notch. In this case, the hammer did fall into the safety intercept notch as expected.

*Gunshot Residue Analysis*

Tim Beckham, a senior special agent with the KBI, went to the residence where Charity died and used a primary gunshot residue (PGSR) test kit to collect samples from Wojtczuk's hands and face to test for the presence of gun powder. Agent Beckham testified that when he first saw Wojtczuk, Wojtczuk had bags over his hands, and he was told Wojtczuk had not washed his hands and Wojtczuk is left-handed.

Trevor Christenson, a forensic scientist for the KBI's trace evidence section, testified that he uses laboratory equipment to assess samples and detect the presence of elements common to ammunition. Regarding the PGSR kit collected from Charity, Christenson testified he found she had particles consistent with gunshot residue on her left hand, right hand, and face. He denied knowing she had injuries to her left hand. Regarding the PGSR kit collected from Wojtczuk, Christenson testified he found particles consistent with gunshot residue on his left hand, right hand, and face. Christenson testified that the particles he found on Charity and Wojtczuk where lead, barium, and antimony, which are components of primary gunshot residue, and this combination of all three can only come from the discharge of a firearm. When these elements are present on a person, Christenson stated, "That means that person has either discharged a firearm, been in the presence of a firearm when it was discharged, or [came] into contact with an object that also has primary gunshot residue on it."

*Swab and Carhartt Jacket Analysis*

Lisa Burdett, a forensic science supervisor and forensic biologist with the KBI, testified that she was asked to examine the Carhartt jacket; shotgun; swabs from the shotgun, loft area, kitchen, living room, and bathroom; and known blood samples from Charity and Wojtczuk.

Burdett testified that blood was present on the Carhartt jacket. She said a sample from a bloodstain on the right sleeve of the jacket had a DNA profile consistent with Wojtczuk and Charity, as well as an unknown individual. Bloodstain samples from a different part of the right sleeve, the shoulder, near a pocket, the left breast area, the back of the left sleeve, the back right shoulder, back right sleeve, and other areas that are not clear from the record, had a DNA profile consistent with Charity.

Burdett testified that swabs of the shotgun from inside of the barrel, outside of the muzzle, the wooden portion of the firearm, and the trigger and release were negative for blood. Although there was no blood on the shotgun, Burdett testified she obtained a partial DNA profile from the muzzle end and inside barrel of the firearm, containing a mixture from two people. She found that Wojtczuk was a partial major contributor, and the minor profile was insufficient to compare. Burdett explained that, because there was no blood, the DNA on the end of the gun could have resulted from touching it or from saliva. The swab taken from the trigger and release area of the firearm had DNA matching only Wojtczuk.

Verla King, a criminal intelligence analyst supervisor with the KBI, testified that she reviewed phone records and text messages in this case, as well as Charity's Facebook records. King confirmed that at 2:32 p.m. on April 8, 2020, Wojtczuk sent Charity a text stating, "'Sick to my stomach. I've tried for six months plus to get you to get rid of these. Why aren't I good enough for you or anyone for that matter. All in.'" This message included screenshots of Charity's phone, but those were not provided on appeal. King said she found emails between Wojtczuk and Charity from April 6 thru 8, in which the parties are angry at each other—Wojtczuk says Charity becomes vile toward him, and Charity says that Wojtczuk accuses her of cheating all the time.

King found that at 10:52 p.m. on April 8 the parties began texting. In the texts, Wojtczuk was upset that Charity had called "him" a hottie, likely referring to Dyllan, and

16

Charity responded that he was really upset due to the baby picture with her ex. They continue to fight, and eventually, at 11:21 p.m., Wojtczuk asks if he can go get his clothes from the garage without an issue. King confirmed that this was the last message Charity sent or received using her phone and that Wojtczuk continued to use his phone. The morning after the shooting, King testified that Wojtczuk sent a text message saying, "'My wife accidently shot herself.'"

*Wojtczuk's Case-in-Chief*

In his case-in-chief, Wojtczuk called Collin Hockett to testify in an effort to explain why Wojtczuk had the shotgun. Lieutenant Hockett, a patrol supervisor lieutenant with the Rooks County Sheriff's Office, responded to the residence in this case on March 21, 2020, due to a possible burglary. He testified that he obtained a statement from Charity that day, and "[s]he said that she would protect her family. She would call law enforcement but protect her family first." Lieutenant Hockett said his reply was to nod his head and say, "[O]kay." When he testified, Wojtczuk confirmed the burglary occurred. He stated that when they discovered the burglary, he got the shotgun from upstairs and took it with the family to vacate the residence because they feared someone was still in the house. After the burglary, Wojtczuk said he slept in the house with the shotgun next to his side of the bed in a bedroom.

Testifying in his own defense, Wojtczuk stated that he met Charity in June or July 2019 in Texas, and they had talked online before meeting in person. He testified that when they left Texas, they went to McCook, Nebraska, to stay with Charity's mother, and then they went to Woodston in late February to stay at the residence where the shooting occurred. Once in Kansas, Wojtczuk testified that Charity asked him to marry her. Wojtczuk said that communication between him and Charity was difficult most of the time.

17

Wojtczuk testified that what they fought about most was "each of us still being on chat sites, still talking to people that I wouldn't say we shouldn't have been talking to, but I think my biggest issue wasn't the fact of actually doing it, it was the hiding part of it." Wojtczuk confirmed he still had the Plenty of Fish dating app on his phone and continued to talk to women while he and Charity were together. However, he said that he stopped using the dating app, though his profile was still up, and he said Charity removed some of the things from her phone that he was concerned about.

When provided a document of text messages between himself and Charity, Wojtczuk testified that, when they were fighting, he would talk about leaving her. Wojtczuk said that Charity would respond by begging him to stay or by threatening to kill herself.

On April 6, 2020, the day after their wedding, Wojtczuk testified that Charity hit him with a computer cord. He said she hit him once or twice during their relationship, and he denied that he ever hit Charity. Wojtczuk stated that he and Charity continued to fight the next couple of days.

On the morning of April 8, Wojtczuk testified that after they awoke, he and Charity were arguing, and he was saying he was going to leave. He said he was packing his clothes, and Charity kept dumping them out. Then he and Charity went shopping to buy things for the house. He explained that just he and Charity went shopping so they could talk about their issues, and he felt they got to an understanding, though they did not resolve their problems. In the afternoon and into the evening, Wojtczuk said he put the plywood floor down for the garage loft and prepared the walls for drywall. Wojtczuk confirmed that, later in the evening, he became upset because Charity made a comment to someone about "'a couple of hotties'" being at the house. He confirmed Brad came to the garage to talk to him and Charity, they prayed together, and Wojtczuk believed they were back to being good with each other.

18

That evening, Wojtczuk testified he was working in the loft and Charity was in their bedroom in the house. At about 11:30 p.m., he texted her asking if he could go get his clothes from their room in the house without issue—because she had thrown out clothes he tried to pack earlier—and a short time later he went and asked Charity to come to the loft to lie down. Wojtczuk said that after she came to the loft, he went inside the house to get his cigarettes and liquor, and he also picked up the shotgun. Wojtczuk then saw Alaina, Charity's pregnant daughter, and she looked ill. He brought the shotgun to Charity in the loft and told her he was going to make steaks for everyone and would be back in a little bit.

When the steaks were done, Wojtczuk testified that he brought a steak and his cigarettes up to the loft. Charity was asleep, so he shook her awake and told her she should check on Victoria, who was making out with Dyllan in the house, even though she was pregnant by another man. This started an argument, and Wojtczuk told Charity he was really thinking of leaving this time and going to his uncle's house in Illinois. Wojtczuk testified that Charity threatened to kill herself, and he responded that he would stay until she figured out if she wanted to be married to him or not. On cross-examination, Wojtczuk said Charity had gotten the gun in her hands when she threatened to kill herself this first time and was holding it up and down to her right side with her left hand towards the top of the firearm and her right hand lower. He denied that he tried to reach for the gun that time. Wojtczuk said he was sitting or kneeling at the foot of the bed at this time due to the low ceiling in the loft.

On cross-examination, Wojtczuk said they continued to argue. He again told Charity he was leaving, and then he turned away from her. Wojtczuk testified that he turned around and Charity said, "'It don't matter if you are going to leave me now or in a week'" and "'I might as well kill myself and end things,'" and he then lunged at her to grab the gun from her. Wojtczuk grabbed the gun but "she don't want to let go of it. And I

19

kind of just—I guess I lunged forward like if you were falling forward and tried to push it away from her . . . . But I grabbed right in the center where the trigger and the hammer would be." On cross-examination, Wojtczuk testified that he grabbed the gun in the middle and pushed it up and away from Charity when it fired. He stated he was almost face to face with Charity when the gun fired, shooting her in the chest. He freaked out and tried to hold her, but there was nothing he could do.

Wojtczuk said he screamed as loud as he could for help, but when no one came, he went down the stairs and into the house. Wojtczuk testified that he saw Dyllan and told him to call 911 because Charity had been shot. On cross-examination, Wojtczuk testified he might have said "'Charity got shot'" or "'is shot,'" but he was not sure which. Wojtczuk confirmed that Dyllan, B.D., Brad, and Officer Goodenow all testified that he told them, "'She shot herself.'" Wojtczuk said he and Leona argued about the gun when he tried to go back up. When Leona said Charity could not have done this to herself, he responded, "'I know, it was an accident.'" Wojtczuk denied intending to kill Charity.

On cross-examination, Wojtczuk confirmed he sent the text about getting his clothes to Charity at 11:21 p.m. All these events—being upset, bringing things to the loft, cooking steaks, etc.—occurred before 911 was called at 11:46 p.m., a span of 25 minutes.

Wojtczuk also confirmed on cross-examination that he initially told Officer Goodenow he had just brought a steak to Charity in the loft, turned around, and there was an explosion. He initially told Officer Goodenow that he did not even see the gun. Regarding his statements to Agent Beckham, Wojtczuk said he "didn't tell [Beckham] all of it" because he was scared. He stated he felt responsible for Charity's death because he tried to grab the gun from her. Wojtczuk denied telling any officers that Charity tried to commit suicide, and instead he testified that he only ever said she had reached for the gun and that it fired when he was trying to take it away.

20

*April 9, 2020—Morning Interview*

Agent Beckham was recalled for the State's rebuttal, and he testified he first interviewed Wojtczuk on April 9 at the Rooks County Sheriff's Office in a conference room. He interviewed Wojtczuk in segments on April 9—at 4:21 a.m., 4:55 a.m., and 5:28 a.m. Over Wojtczuk's objection, the district court admitted the video recording of these interviews into evidence. The district court also admitted the audio recording of these interviews at trial.

In the early morning interview on April 9, Wojtczuk stated that he brought a steak to Charity in the loft where she was sleeping, Charity woke up, he turned to go get his cigarettes, and he heard a bang. Wojtczuk recalled that he was standing to get his cigarettes from either the railing or downstairs. Agent Beckham testified that Wojtczuk said he did not even know the firearm was in the loft. Rather, he told Agent Beckham they always kept the shotgun next to the bed, it was normally loaded, and the last time he touched the firearm was Tuesday night, which would have been April 7. In the footage, Wojtczuk told Agent Beckham he threw things out of the way when he went to help Charity, which may have included the firearm.

When Agent Beckham asked Wojtczuk if he shot Charity, Wojtczuk responded, "No, by no means." Wojtczuk also said that she would not have shot herself on purpose, though he later told Agent Beckham that about a month before, Charity threatened to shoot herself with the shotgun and had put the gun up to her head.

*April 9, 2020—Afternoon Interview*

Agent Beckham testified that he and former Special Agent Andy Thayer interviewed Wojtczuk again on April 9 at about 4:55 p.m. in an interview room at the sheriff's office. The State offered—and the district court admitted—the videotape of this

21

afternoon interview, which is provided on appeal. Agent Beckham testified, and the footage confirms, that Wojtczuk said Charity took the gun to the loft, the gun was loaded, and the hammer might have been cocked due to things the night before. Further, Agent Beckham said, and the footage shows, that Wojtczuk said he brought Charity a steak, woke her up from sleeping, and then turned around to get his cigarettes when he heard the boom and saw the flash. In the footage, Wojtczuk said the gun was next to the bed on Charity's left side, and when he was turned around, he saw her moving out of the corner of his eye but did not see her pick up the gun. He also says in the footage that Charity was right-handed.

Agent Beckham asked Wojtczuk if he saw the gun during this incident, and Wojtczuk said "he does not remember seeing the gun, grabbing the gun, or moving the gun." Agent Beckham testified, and the footage confirms, that Wojtczuk said he ran into the house and said, "'Charity's been shot. Charity shot herself, I'm not joking. She's bleeding to death.'" Additionally, Agent Beckham asked Wojtczuk how the gun shot Charity, and Wojtczuk said it was a "mishap." In the footage, Wojtczuk also says it must have been an accident.

*April 10, 2020—Afternoon Interview*

Agent Beckham interviewed Wojtczuk on April 10, 2020, at about 6:28 p.m. The State offered the video footage of this interview, the district court admitted it, and it is provided on appeal. Agent Beckham testified this interview occurred after Charity's body had been autopsied and other evidence was collected, and he confronted Wojtczuk with the evidence, indicating that the evidence did not conform with his story of what happened. Specifically, when Agent Beckham testified when he showed Wojtczuk photos of Charity's body, he said, "'I was the one holding the damn gun. It was an accident'" and that he "'wasn't trying to shoot her. Wasn't trying to do nothing. Was just moving the damn gun.'"

22

In the footage, Wojtczuk said he was basically trying to move the gun from the side of the bed and was handing it to her to put it elsewhere, he was holding it around the grip or trigger area like usual, and she was reaching up to get the food or something. Wojtczuk stated he was on the stairs near the loft and hit his head on a crossbeam and confirmed the gun went off. Agent Beckham testified in conformity with the footage regarding the placement of Wojtczuk's hand and that he said he hit his head on the cross bar. Further, Wojtczuk told Agent Beckham that he took the gun up to the loft.

In the footage, one of the agents asked Wojtczuk why the hammer of the shotgun was pulled back, and he said he did not know, but then stated there were coyotes outside the night before and that could be why. Toward the end of the interview, Wojtczuk said, "I had the gun and she got shot. That's my wife and it's my fault. It's not my fault, but it's my fault. Damn thing shouldn't have been up there in the first place." Agent Beckham recalled this statement at trial.

At trial, Agent Beckham denied that Wojtczuk ever told him Charity was holding the firearm in the manner Wojtczuk described in his testimony at trial or that he had said he lunged for the firearm and grabbed it in the center. He also denied that Wojtczuk ever said Charity was holding the firearm, though Wojtczuk did tell Agent Beckham that Charity was reaching to grab it.

The jury found Wojtczuk guilty of intentional second-degree murder. The court sentenced Wojtczuk to 285 months in prison for intentional second-degree murder and a consecutive term of 8 months for the criminal possession of a firearm conviction for a total of 293 months. Wojtczuk filed a timely appeal.

ANALYSIS

I. *Did the district court err by instructing the jury on reckless second-degree murder as a lesser included offense of intentional second-degree murder?*

Wojtczuk argues the district court erred by providing the jury with an instruction on reckless second-degree murder as a lesser included offense of intentional second-degree murder.

This court reviews claims of instructional error in three steps. First, we consider jurisdiction and whether the issue is preserved. Next we analyze whether the instruction was legally and factually appropriate. Finally, we review any error identified for harmlessness. The standard applied in the final step varies depending upon the context and whether the claim was properly preserved. *State v. Martinez*, 317 Kan. 151, 162, 527 P.3d 531 (2023).

*Additional Facts*

When it came time to discuss what lesser included offenses to provide the jury, Wojtczuk's counsel objected to inclusion of reckless second-degree murder, arguing the facts do not show extreme indifference and that an instruction on involuntary manslaughter was appropriate instead. The court noted that the facts, when viewed in Wojtczuk's favor, showed he tried to wrestle a loaded shotgun out of Charity's hands and the gun went off, shooting her. As a result, the court found that an instruction on reckless second-degree murder due to the extreme indifference to the value of human life was warranted because there was evidence presented that Wojtczuk wrestled over a loaded gun. The court also found an instruction on reckless involuntary manslaughter, requiring recklessness but not extreme indifference, was appropriate.

*Step One: Preservation*

Wojtczuk objected to provision of the reckless second-degree murder instruction to the jury, properly preserving it for appeal.

*Step Two: Legal and Factual Appropriateness*

This court has unlimited review of the record to determine whether the provided instruction was legally and factually appropriate. *State v. Holley*, 313 Kan. 249, 254, 485 P.3d 614 (2021). When considering the legal appropriateness, this court "'asks whether the lesser crime is "legally an included offense of the charged crime."'" *State v. Bernhardt*, 304 Kan. 460, 473, 372 P.3d 1161 (2016). Reckless second-degree murder is considered a lesser included offense of intentional second-degree murder because it is a lesser degree of the same crime. K.S.A. 21-5403; K.S.A. 21-5109(b)(1); see also *State v. McCarley*, 287 Kan. 167, 177-78, 195 P.3d 230 (2008) (reckless aggravated battery is a lesser included offense of intentional aggravated battery because it is a lesser degree of crime under K.S.A. 21-5109[b][1]). As a result, an instruction on reckless second-degree murder was legally appropriate. See *State v. James*, 309 Kan. 1280, 1298, 443 P.3d 1063 (2019).

To determine whether an instruction was factually appropriate, this court reviews the evidence in the light most favorable to the defendant. *Bernhardt*, 304 Kan. at 469. As an initial note, the trial court was not required to accede to Wojtczuk's request not to provide the instruction on reckless second-degree murder. Rather, the trial court is statutorily required to provide instructions on lesser included offenses where there is "some evidence which would reasonably justify a conviction of some lesser included crime" even if the defendant objects to inclusion of that lesser included offense. K.S.A. 22-3414(3); see also *State v. Cordray*, 277 Kan. 43, 53-54, 82 P.3d 503 (2004) (although defendant objected to inclusion of any lesser included offenses, the trial court must

25

provide instructions on those lesser offenses because there was some evidence to support them under K.S.A. 22-3414[3], which has remained unchanged); *State v. Krider*, 41 Kan. App. 2d 368, 379, 202 P.3d 722 (2009) (relying on *Cordray* for proposition that trial courts have a duty to instruct on lesser included offenses if there is some evidence which would reasonably support a conviction). In assessing whether there is some evidence to support a lesser included offense, this court considers not only the evidence proffered by the defendant, but also evidence presented by the State. *State v. Simmons*, 295 Kan. 171, 177, 283 P.3d 212 (2012). The district court is required to provide instructions on such lesser included crimes "even if the evidence is weak or inconclusive." *State v. Roberts*, 314 Kan. 835, 852, 503 P.3d 227 (2022).

Wojtczuk asserts that the reckless second-degree murder instruction was not factually appropriate because there is no evidence to support a finding that he acted with extreme indifference to human life. Instead, he argues that the statements in his April 10 interrogation—where he said he hit his head on the crossbar and the gun accidently discharged—and his testimony at trial that he was wrestling the gun from Charity each showed recklessness but not extreme indifference to human life.

Reckless second-degree murder is "the killing of a human being committed . . . unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 21-5403(a)(2). Involuntary manslaughter is "the killing of a human being committed . . . [r]ecklessly." K.S.A. 21-5405(a)(1). In Kansas, "[a] person acts 'recklessly' . . . when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 21-5202(j).

Wojtczuk argues that Kansas appellate courts have found the necessary degree of recklessness for second-degree unintentional murder only where "a firearm was

26

*intentionally* discharged *without* an intent to kill or that a defendant was *exceedingly* cavalier in his handling of a loaded gun." This is incorrect because the focus is not on whether "a deliberate and voluntary act" led to the killing but is instead on whether the killing was intentional or unintentional. See *State v. Brown*, 300 Kan. 565, 588, 331 P.3d 797 (2014) (assessing *State v. Deal*, 293 Kan. 872, 885, 269 P.3d 1282 [2012]). This logic led the Kansas Supreme Court to find an instruction on reckless second-degree murder was warranted when a defendant intentionally pointed a firearm at the victim but was lowering the firearm when it unintentionally discharged, resulting in the killing. See *State v. Tahah*, 293 Kan. 267, 272-73, 262 P.3d 1045 (2011) (defendant said he was lowering his firearm, which was pointed at the victim, when it "'went off'" and said he did not intend to kill the victim).

In this case, there was significant and undisputed evidence to find Charity did not shoot herself as Wojtczuk originally stated to multiple occupants of the residence, as well as in his interrogations the morning of April 9. Her right arm was down at her side, and she had an injury to her left hand that could only have resulted from the fired weapon. Further, Charity's arms were too short to reach the trigger while the gun was pointed at her chest in a downward angle from left to right, and there was no blood on the firearm, though there were copious amounts of blood on Charity. This means the evidence is more in line with Wojtczuk's statements in the April 10 interrogation and his statements at trial.

In his interrogation on April 10, Wojtczuk stated that he took the firearm to the loft and then was moving it from one side of the bed to the other while standing at the stairs. Wojtczuk said he was holding the shotgun around the grip or trigger area, and he hit his head on a crossbeam and the gun went off. In contrast, at trial Wojtczuk testified that he brought the shotgun to the loft and then went to get other items before returning upstairs. He said that he got into an argument with Charity and told her he was going to leave her, and she was holding the firearm and threatened to kill herself. He told her he would stay, but then he said he was leaving again. She again threatened to kill herself,

27

and he lunged at her to take the shotgun. Wojtczuk testified that he grabbed the gun in the center where the trigger and hammer are, pushed it up and away from Charity, and the gun fired.

In both scenarios, Wojtczuk stated that he did not intend to kill Charity. Although the circumstances surrounding the gun firing in these statements were different, in both scenarios Wojtczuk said he was holding or grabbing the shotgun around the trigger area, and he knew the gun was loaded and may have had the hammer cocked. The evidence was undisputed that, when the hammer of this firearm was cocked, jostling and hitting it with a mallet resulted in the hammer falling into the safety intercept notch rather than resulting in an unintentional firing. Further, when the hammer was cocked and the trigger was tested, it would not fire unless more than 2 pounds of pressure was applied— meaning it did not have a light trigger.

Clearly, there was evidence from which a jury could find Wojtczuk's actions in handling the loaded and cocked firearm were reckless such that either reckless second-degree murder or involuntary manslaughter may be implicated. "The 'difference between unintentional second-degree murder and involuntary manslaughter is one of degree and not one of kind.'" *James*, 309 Kan. at 1300 (quoting *State v. Gonzalez*, 307 Kan. 575, 583, 412 P.3d 968 [2018]). It is the jury's prerogative to place a defendant's conduct on this spectrum of recklessness "'by deciding whether the facts showed he was not just reckless in disregarding the risk that [the victim] would die, but also extremely indifferent to the value of human life.'" *James*, 309 Kan. at 1300-01.

In this case, there was evidence by which jurors could find Wojtczuk acted recklessly, but "the evidence did not foreclose culpability at either end of the spectrum for the results of his reckless acts." 309 Kan. at 1301. As a result, this panel concludes the instruction on reckless second-degree murder, in combination with the involuntary manslaughter instruction, was factually appropriate.

28

*Step Three: Harmlessness Inquiry*

Even though we find provision of the reckless second-degree murder instruction was appropriate and not error, we continue to the harmless error inquiry. Because Wojtczuk preserved this issue for appeal by objecting to inclusion of the instruction, this court applies one of two harmless error tests. If the instructional error impacted Wojtczuk's constitutional rights, we assess whether the error was harmless under the federal constitutional harmless error standard, i.e., whether there was no reasonable possibility that the error contributed to the verdict. Here, the parties agree no constitutional right was impacted, so we instead assess whether there is no reasonable probability the error affected the trial's outcome in light of the entire record. *Holley*, 313 Kan. at 256-57; see also *James*, 309 Kan. at 1301-02 (applying the statutory harmless error test to instructional error issue).

Wojtczuk argues the alleged error in this case affected the trial's outcome because provision of the reckless second-degree murder instruction "functionally prevent[ed] jurors from considering whether to return a still-lesser voluntary manslaughter verdict that would have been supported by trial evidence." He states that the jurors questioned the strength of evidence as to intentional second-degree murder and should have been allowed to look at voluntary manslaughter at that time. But the jury was prevented from doing so because the State asserted in closing that the jury had to assess reckless second-degree murder before voluntary manslaughter. Wojtczuk argues that, had the reckless second-degree murder instruction not been given, the jury would have moved from intentional second-degree murder to voluntary manslaughter, and such consideration would have resulted in a lesser conviction. Therefore, he argues there was a reasonable probability the error affected the trial's outcome.

29

Wojtczuk's argument is similar to that asserted in *State v. Sims*, 308 Kan. 1488, 431 P.3d 288 (2018). In *Sims*, the defendant was charged with first-degree murder, and the jury was instructed on the lesser included crimes of intentional second-degree murder, reckless second-degree murder, and voluntary manslaughter. The jury convicted the defendant of first-degree murder. On appeal, he argued his due process right to present his defense was violated and he was deprived of the opportunity to be convicted of self-defense voluntary manslaughter because that instruction told the jury that, "'If you do not agree that the defendant is guilty of reckless murder in the second degree, you should then consider the lesser included offense of voluntary manslaughter.'" 308 Kan. at 1498-99, 1504. The defendant in *Sims* argued this ordering instruction erroneously prevented the jury from considering voluntary manslaughter contemporaneously with first-degree murder and intentional second-degree murder. The Kansas Supreme Court overruled precedent that allowed simultaneous consideration of these crimes, finding that rule unworkable. 308 Kan. at 1503-04. The *Sims* court noted the trial court read the jury each homicide instruction and then read an instruction advising the jury of the available charges, and that if "'there is a reasonable doubt as to which of the four offenses the defendant . . . is guilty, he may be convicted of the lesser offense only.'" 308 Kan. at 1504-05. Because "[t]he district court explained the elements of each offense, explained [the defendant's] defense, and then told the jury to select the outcome for the homicide consistent with its view of the evidence," the ordering language used in each instruction did not prevent the jury from considering his defense of self-defense. 308 Kan. at 1505.

In this case, the trial court instructed the jury on the elements of each offense in descending order of seriousness; each instruction included the same language the defendant challenged in *Sims*; and the jury was instructed that if there was reasonable doubt as to which of two or more offenses Wojtczuk was guilty, it could only find him guilty of the lesser offense if proven beyond a reasonable doubt. See also *State v. Carter*, 305 Kan. 139, 161, 380 P.3d 189 (2016) (Kansas has "recognized five degrees of homicide, in descending order of seriousness: capital murder, first-degree murder,

30

second-degree murder, voluntary manslaughter, and involuntary manslaughter.");
*Bernhardt*, 304 Kan. at 474 ("[I]n the interests of promoting an orderly method of considering the possible verdict, 'a trial court should instruct on lesser included offenses in the order of severity beginning with the offense with the most severe penalty.'"). We find the ordered method of considering the jury instructions sequentially did not prevent the jury from considering whether Wojtczuk acted in a sudden quarrel. "By instructing as it did, the trial court ensured the jury would consider all the offenses and select the appropriate verdict." *Sims*, 308 Kan. at 1505.

Further, there was evidence to support the jury's finding that Wojtczuk acted intentionally, rather than just knowingly, and would have convicted him of intentional second-degree murder regardless of the reckless second-degree murder instruction. The jury was instructed that "[a] defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State or cause the result complained about by the State." The evidence showed that the shotgun was loaded with the hammer cocked and the trigger functioned normally by requiring at least 2 pounds of pressure to release. Additionally, because her right arm was by her side and her left hand was hit by the bullet, a juror could conclude Charity was not even touching the shotgun when it fired. This evidence contradicts Wojtczuk's explanation that the firearm accidently fired when he was grabbing it away from Charity or when he was moving it and bumped his head.

As a result, this panel finds that there is no reasonable probability the jury would have convicted Wojtczuk of voluntary manslaughter regardless of the instruction on reckless second-degree murder. *Holley*, 313 Kan. at 256-57.

II.      *Did the prosecutor commit error by arguing jurors could not consider convicting Wojtczuk of voluntary manslaughter if they found he committed an intentional killing?*

Wojtczuk argues the State committed error by arguing in closing that jurors could not consider a voluntary manslaughter verdict unless they first doubted whether the State had proven every element of intentional second-degree murder beyond a reasonable doubt. According to Wojtczuk, the State improperly dissuaded the jury from considering a mitigated homicide verdict and this matter must be remanded for a new trial. The State responds that it did not misstate the law, as the law requires juries to review instructions on lesser included crimes in descending order.

*Additional Facts*

In closing, the State argued that the evidence supported a finding of guilt as to intentional second-degree murder, and if the jury agreed then it would stop its consideration at that point.

> "If the State has proved to you beyond a reasonable doubt that he is guilty of second intentional, you are done. There's nothing else you need to do. You sign the top line, guilty intentional. You do the verdict form, and you are done.
> "But if you cannot agree that this was an intentional act, if you cannot all agree to that, then you go to the next step; and that is second reckless. And you take these one at a time. You don't jump to whichever one you might like. That's not how it works. You start at the top and you work your way down. They are lesser-included offenses.
> "So if the State didn't meet its burden on intentional? Move to second reckless."

Later, the State argued the jury should only consider voluntary manslaughter if it could not find Wojtczuk guilty of either intentional or reckless second-degree murder. "Intentional, can't decide; reckless, can't decide; that's the only time you move to voluntary manslaughter."

32

Lastly, the State asserted the jury should consider involuntary manslaughter if it found reasonable doubt as to all the other charges. The jury was provided instructions on intentional second-degree murder, reckless second-degree murder, voluntary manslaughter, and involuntary manslaughter in that order.

*Standard of Review*

This panel must use the two-step process—assessing error and then prejudice—set out by the Kansas Supreme Court to review Wojtczuk's claim of prosecutorial error. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022).

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

See also *State v. Fraire*, 312 Kan. 786, 791-92, 481 P.3d 129 (2021). To protect the defendant's right to due process, this court reviews a claimed misstatement of law in the State's closing argument even when the defendant failed to timely object at trial. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021); *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006).

*Discussion*

A prosecutor commits error by misstating the law. *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021). Wojtczuk argues the prosecutor in this case misstated the law by telling the jury it could not consider the lesser offense of voluntary manslaughter unless it first decided there was reasonable doubt that the defendant committed intentional second-degree murder and reckless second-degree murder. He argues this was a misstatement because once the jury found all the elements of intentional second-degree murder were satisfied, it should have been allowed to consider whether the mitigating factor in voluntary murder—sudden quarrel—was present.

As stated above, it is proper to direct jurors to consider a charged offense and its lesser included offenses in sequential order from most to less severe. *Carter*, 305 Kan. at 161 (Kansas has "recognized five degrees of homicide, in descending order of seriousness: capital murder, first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter."); *Bernhardt*, 304 Kan. at 474 ("[I]n the interests of promoting an orderly method of considering the possible verdict, 'a trial court should instruct on lesser included offenses in the order of severity beginning with the offense with the most severe penalty.'").

Additionally, the Kansas Supreme Court has held that "[w]hen discussing jury instructions, a prosecutor generally does not misstate the law by telling jurors to move on to consideration of lesser included offenses only if they do not agree or if they do not find the defendant guilty of the greater offense." *State v. Hillard*, 313 Kan. 830, Syl. ¶ 8, 491 P.3d 1223 (2021). In *Hillard*, the defendant was charged with first-degree murder, and the jury was given instructions on the lesser included offenses, including intentional and reckless second-degree murder. In closing, the prosecutor in *Hillard* told the jury to "'stop here'" and "'you do not need to consider any of those lessers,'" unless it first disagreed or doubted the defendant's guilt as to the greater offense. 313 Kan. at 846-47. On appeal, the

34

Kansas Supreme Court cited its opinion in *Sims* and noted it had already approved of instructions ordering jurors to consider charged offenses and lesser included offenses in decreasing sequential order. 313 Kan. at 847. The court found the prosecutor in *Hillard* merely reframed what the instructions said, "e.g., 'If you do not agree that the State has met its burden . . . you should then consider the lesser included offense'" and then "'directing jurors to move on to consideration of lesser included offenses *only* if they do not agree or if they do not find the defendant guilty of the charged offense is not coercive and correctly states the law.' (Emphasis added.)" 313 Kan. at 847-48.

This case presents the same question addressed in *Hillard*. In closing, the State directed the jury first to consider the charged crime and move on to the lesser included charges in sequential order only if it believed the State had not met its burden of proof as to the greater charge. This court finds the prosecutor's statements did not misstate the law and were not erroneous.

*Harmlessness Inquiry*

The next step in the analysis is consideration of whether the prosecutor's arguments in closing were harmless. In doing so, this panel assesses whether the State can demonstrate beyond a reasonable doubt that the prosecutor's statements did not affect the outcome of the trial in light of the entire record. *Sherman*, 305 Kan. at 109.

The conviction of intentional second-degree murder required the jury to find beyond a reasonable doubt that Wojtczuk intentionally killed Charity, while a conviction for voluntary manslaughter would require the jury to find he knowingly killed Charity during a sudden quarrel. Although there was ample evidence that Wojtczuk and Charity's relationship was rife with conflict, there was also ample evidence from which a jury could reasonably conclude Wojtczuk acted intentionally—not just knowingly—in shooting her. The jury was instructed that "[a] defendant acts intentionally when it is the

35

defendant's desire or conscious objective to do the act complained about by the State or cause the result complained about by the State." It was further instructed that "[a] defendant acts knowingly when the defendant is aware of the nature of his conduct that the state complains about or that his conduct was reasonably certain to cause the result complained about by the state."

The evidence was undisputed that the shotgun was loaded with the hammer cocked, could only be fired by pulling the trigger, and a standard amount of force was required to pull the trigger. Further, the evidence showed that Charity clearly was not holding or even touching the trigger of the shotgun when it was fired, as her right arm was at her side and her left hand was in front of the barrel. There was evidence from which a jury could find beyond a reasonable doubt that, even if Wojtczuk did hit his head on the beam, he held the loaded and cocked shotgun, he pointed the shotgun toward Charity, and he pulled the trigger.

This court finds, in light of the entire record, even if the prosecutor's statements were erroneous, the State demonstrated beyond a reasonable doubt that the prosecutor's statements did not affect the outcome of the trial. *Sherman*, 305 Kan. at 109.

III.    *Voluntary dismissal of Issue III pursuant to Supreme Court Rule 5.04(a)*

In his third issue, Wojtczuk argued the district court erred by informing jurors that a "trial is a tremendous expense and inconvenience to the parties, the Court, and the taxpayers." This argument was dependent upon specific language in the trial transcript. As the State explained, the court reporter reviewed her audio recording from trial and found the statement was actually that "a mistrial" is expensive and inconvenient, and a corrected copy of the transcript was provided.

Although Wojtczuk moved to withdraw this issue from appeal pursuant to Supreme Court Rule 5.02 (2024 Kan. S. Ct. R. at 32), which addresses motions for extension of time, it appears he intended to voluntarily dismiss these issues pursuant to Supreme Court Rule 5.04(a) (2024 Kan. S. Ct. R. at 32).

This panel grants Wojtczuk's motion to voluntarily dismiss Issue III of his appeal. Rule 5.04(a); see also *In re Z.M.*, No. 97,603, 2007 WL 3341769, at *1 (Kan. App. 2007) (unpublished opinion) (noting the defendant voluntarily dismissed a portion of his appeal pursuant to the predecessor to Rule 5.04).

IV.     *Voluntary dismissal of Issue IV pursuant to Supreme Court Rule 5.04(a)*

In his fourth issue, contemporaneous to filing his appellate brief, Wojtczuk filed a motion to remand for a hearing pursuant to *State v. Van Cleave*, 239 Kan. 117, Syl. ¶ 2, 716 P.2d 580 (1986). Wojtczuk argued that his trial counsel inappropriately disclosed to the venire jury members that he pled guilty to criminal possession of a firearm, and if his *Van Cleave* motion was granted to allow the district court time to decide the narrow ineffective assistance of counsel claim, he could request additional time to fully brief that issue on appeal. This court denied Wojtczuk's motion.

Although Wojtczuk moved to withdraw this issue from appeal pursuant to Rule 5.02, which addresses motions for extension of time, it appears he intended to voluntarily dismiss these issues pursuant to Rule 5.04(a).

This panel grants Wojtczuk's motion to voluntarily dismiss Issue IV of his appeal. Rule 5.04(a); see also *In re Z.M.*, 2007 WL 3341769, at *1 (noting the defendant voluntarily dismissed a portion of his appeal pursuant to the predecessor to Rule 5.04).

V.      *Did cumulative errors deprive Wojtczuk of a fair trial?*

Lastly, Wojtczuk argues cumulative errors deprived him of a fair trial. There were no errors, however, and thus this panel finds the cumulative error rule does not apply. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

Affirmed.